31 A.3d 689

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Orlando MAISONET, Appellant.**

Supreme Court of Pennsylvania.

Argued May 13, 2009.

Decided Nov. 28, 2011.

Bernard L. Siegel, for Orlando Maisonet.

Amy Zapp, PA Office of Attorney General, Hugh J. Burns, Jr., Susan Willcox, Danbury, CT, Philadelphia District Attorney's Office for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice SAYLOR.

This is a capital direct appeal deriving from the killing of Jorge Figueroa.

Mr. Figueroa was stabbed to death in August 1982 in the Colon family home in Philadelphia. His body was taken to an abandoned row house, where it was later discovered by police.

By his own account, Heriberto Colon ("Colon") was a participant in a local drug organization known as the Arroyos, which was responsible for the killing. Soon after its perpetration, police secured Colon's cooperation, and arrest warrants were issued for Arroyo leaders Simon Pirela (also known as Salvator Morales), his brother Heriberto Pirela (also known as Carlos Tirado), and Appellant.

The Pirela brothers were prosecuted and convicted in 1983; Simon Pirela was sentenced to death, and Heriberto Pirela received a life sentence. *See Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985); *Commonwealth v. Tirado,* 341 Pa.Super. 620, 491 A.2d 922 (1985) (table). Appellant eluded capture for the better part of a decade, until he was located in Puerto Rico in 1990 and extradited.

The Commonwealth's theory of the case was that Mr. Figueroa was killed to prevent him from cooperating with police regarding a robbery-homicide perpetrated two weeks earlier. In that criminal episode, restaurant owner Ignacio

Slafman had been shot and killed; the Commonwealth contended that Appellant was the shooter and Mr. Figueroa, among others, served a subordinate role in the robbery. Appellant was separately prosecuted for robbery and first-degree murder in the killing of Mr. Slafman and was initially convicted in May 1992. His trial for the murder of Mr. Figueroa commenced a week later.

At this trial, the Commonwealth opened its case in chief with a witness to the restaurant robbery, who identified Appellant as Mr. Slafman's killer. *See* N.T., June 1, 1992, at 81, 84. Among numerous other witnesses to various of the events surrounding the Figueroa killing, the prosecution presented testimony from Colon to the effect that: he was a member of the Arroyo drug organization; the Arroyos were led by the Pirelas and Appellant; he (Colon) witnessed both killings (Mr. Slafman and Mr. Figueroa); and, although Simon Pirela had initially stabbed Mr. Figueroa, and the victim ultimately died after having been stabbed in the heart by Heriberto Pirela, Appellant had inflicted knife wounds in the interim as well. *See* N.T., June 3, 1992, at 9–39.

The Commonwealth also made extensive efforts to establish Appellant's consciousness of guilt by reference to his flight. Among other evidence, the Commonwealth introduced and displayed a videotape containing an edited composite of several America's Most Wanted programs featuring the Commonwealth's search for Appellant. Before the videotape was displayed to the jurors, at the request of the prosecutor, the trial court provided the following limiting instruction:

Ladies and Gentlemen, the program that has been referred to is a commercial program that is used on one of the channels in Philadelphia and throughout the country wherein they highlight the seeking of someone who is wanted for questioning in various areas. In order to sell their program they make it very dramatic and say America's Most Wanted criminals. That title does not apply to the people whom they are searching and surely it does not apply to anyone in this case. The only reason that this program was utilized and that information is being brought to you is for you to

understand what efforts have been made by the Philadelphia Police in order to locate Mr. Maisonet. That is the only purpose that it is being utilized. You are not to presume or assume that because the program is titled America's Most Wanted that Mr. Maisonet ever was one of the most wanted people in America for anything nor are you to presume or assume that because of that title and because of the use of the media for the purpose that I pointed out that Mr. Maisonet is guilty of any crime. Proof of guilt must be done by evidence presented in open court and evidence of his arrest and the means of using—used to obtain his arrest are not evidence of his guilt.

*Id.* at 136–37.

Immediately after this charge, Appellant's counsel interposed an objection that, because the video contained information about the murder of Mr. Slafman and the subsequent endeavors of his widow, it was unduly prejudicial. The court responded:

I have no doubt that [the tape] is prejudicial. The question is whether the evidentiary value outweighs the prejudice. I think that for the purposes of this case your client has been missing for 10 years and the jury is entitled to know every effort that has been made and extended in trying to locate him. Your questions have indicated that they have not made a thorough effort to locate him and I think that if you are able to do that they should be able to point out how thorough their efforts were to locate him.

*Id.* at 138. Appellant's counsel then affirmed that he was satisfied with the court's instruction. *See id.* at 139. The court proceeded with the following, supplemental charge:

Ladies and Gentlemen, it has been brought to my attention that a videotape will be shown and when it is shown there may be some references in that videotape to other criminal activity for which this defendant is not on trial. I've already told you about that. That is excluded from your consideration in this case. The only purpose of showing the videotape and making reference to this means of trying to locate Mr. Maisonet are to give you an indication of to what extent

the Commonwealth has gone to locate Mr. Maisonet for questioning. That is all.

Any reference to any other activities, criminal or noncriminal, has absolutely nothing to do with this trial and is not part of the evidence that you are to consider and you surely, again let me give you a warning, are not to consider any statements either in the tape or by any witnesses concerning another or other crimes that this defendant was even involved in those crimes or that he is guilty of this crime. Your verdict in this case must be based solely and entirely on the evidence presented in open court dealing with these charges.

*Id.* at 139–40; *accord* N.T., June 9, 1992, at 79 (reflecting the court's similar instruction given in its final guilt-phase charge to the jury, and trial counsel's reaffirmation that he was satisfied with the instruction).

In the defense case, Appellant testified, admitting to his presence at the Colon residence and assistance in removing Mr. Figueroa's body. *See* N.T., June 5, 1992, at 70–77. He denied, however, having participated in the actual killing. *See id.* Appellant claimed to have fled from Philadelphia in fear of the Pirelas, given that he witnessed their perpetration of a killing. *See id.* at 78.

In its charge to the jury, the trial court explained that Appellant could be convicted of first-degree murder as an accomplice, based upon participation in a killing with the requisite intent. *See* N.T., June 9, 1992, at 61.

Appellant was convicted of first-degree murder and related offenses. At the penalty phase, the Commonwealth presented five aggravating circumstances (the victim was killed to prevent testimony as a prosecution witness; torture; significant history of violent felony convictions; conviction of another offense punishable by life imprisonment, *i.e.*, first-degree murder in the *Slafman* case; and a previous voluntary manslaughter conviction, *see* 42 Pa.C.S. § 9711(d)(5), (8), (9), (11), (12)). The jury found four of these (all but the significant-history aggravator) and no mitigating circumstances.

Following the above trials, post-verdict motions were filed in both cases and extensive delays followed. Nearly five years later, in 1996, a new trial was awarded in the Slafman matter. The post-verdict motions languished for many more years, through various substitutions of counsel and a reassignment on the common pleas bench on account of the death of the trial jurist. By 2003, the common pleas court's file had been lost. Although it was reconstructed in part, various of the trial exhibits were never found, including the edited videotape of the America's Most Wanted programing.

Appellant finally was retried in the Slafman case in 2005 and was acquitted of the charged offenses at that time. Based on this acquittal, Appellant filed a motion for extraordinary relief from the verdict in the present (Figueroa) matter, arguing that he should be discharged on account of the Commonwealth's trial theory of an interconnection between the killings. The common pleas court denied relief.

In February 2005, Appellant was formally sentenced to death for the murder of Mr. Figueroa and he proceeded with the present direct appeal. As reflected on the docket, this Court also attempted to locate the full trial record, but many of the trial exhibits remain lost. The Commonwealth has provided what it describes as an unedited version of the America's Most Wanted programing, and an overlapping version was secured and forwarded from the defense side. These items are not part of the certified record in the case, however.

## I. Sufficiency of the Evidence

Although Appellant does not raise a claim of evidentiary insufficiency, our review of the matter is automatic in capital cases. To obtain a first-degree murder conviction, the Commonwealth generally must demonstrate that: a human being was unlawfully killed; the defendant was the killer; and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. §§ 2501, 2502(a); *see, e.g., Commonwealth v. Moore,* 594 Pa. 619, 628, 937 A.2d 1062, 1067 (2007). A conviction may be predicated upon an accomplice liability theory, if the facts support the conclusion that the defendant aided, agreed to aid, or attempted to aid a principal in

planning or committing the offense, and acted with the intent to promote or commit the offense, namely, the intentional killing. *See, e.g., Commonwealth v. Pagan*, 597 Pa. 69, 83, 950 A.2d 270, 279 (2008). The evidence and attendant, reasonable inferences are considered in the light most favorable to the Commonwealth, as the verdict winner. *See, e.g., Commonwealth v. Crews*, 436 Pa. 346, 348, 260 A.2d 771, 771–72 (1970).

Here, the Commonwealth's proofs are plainly sufficient to support the verdict, particularly in light of direct eyewitness testimony, including that of Colon. *See, e.g.*, N.T., June 3, 1992, at 9–39.[1] Indeed, as noted, Appellant confirmed his presence at the scene of the killing, as well as his participation in concealing Mr. Figueroa's body. *See* N.T., June 5, 1992, at 70–77. His difference as to the degree of his participation in the greater crimes was properly a matter for the jury.

## II. Waived Claims

Appellant presents the following series of claims, as to which he has failed to preserve the issues: a challenge to the trial court's first-degree murder charge; a challenge to the admission of collateral evidence concerning threats and violence to witnesses; and claims of prosecutorial misconduct. With regard to each category of these claims, Appellant has failed to identify the place in the record where the questions are preserved, as is required in the salient procedural rules, *see* Pa.R.A.P. 2117(c), 2119(e); the Commonwealth observes that the claims are waived; Appellant offers no response; and our independent review confirms that there was no contemporaneous objection. In the circumstances, merits review is not

---

1. Although Colon might have been regarded by the jurors as a corrupt and polluted source, *see* N.T., June 9, 1992, at 62–64 (reflecting the trial court's accomplice-testimony instruction relative to Colon), this Court has long held that a verdict may be premised upon the uncorroborated testimony of an accomplice. *See, e.g., Commonwealth v. Mikell*, 556 Pa. 509, 516, 729 A.2d 566, 570 (1999); *Commonwealth v. Bruno*, 316 Pa. 394, 402, 175 A. 518, 521 (1934). In any event, in the present case, there was substantial corroboration in the form of physical evidence and eyewitness testimony concerning the perpetration of the killing in the Colon home, *see, e.g.*, N.T., June 2, 1992, at 28–53 (testimony of Elizabeth Colon Delgado); *id.* at 73 (testimony of a detective as to the blood collected from the basement of the Colon residence).

implicated. *See generally* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").[2]

## III. The Effect of the Acquittal

█ Appellant argues that his ultimate acquittal of the murder of Mr. Slafman undermines the Commonwealth's motive theory and requires a new trial. Although he concedes that no evidence of his actual conviction in the Slafman case was introduced at the guilt phase of his trial, Appellant contends nonetheless that he is now entitled to rebut the Commonwealth's motive theory with the fact of his acquittal of the salient offenses. He characterizes the acquittal as "after-discovered evidence" and invokes principles of fundamental fairness and due process in general terms. Appellant acknowledges this Court's decision in *Commonwealth v. McCall*, 567 Pa. 165, 786 A.2d 191 (2001) (reasoning that a subsequent acquittal for an offense used as motive evidence in obtaining a conviction for another offense does not *per se* invalidate the conviction). Appellant observes, however, that *McCall* is premised in significant part on *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (holding that the introduction of evidence relating to a crime of which the defendant had been acquitted previously did not implicate double jeopardy or violate due process), and stresses that the jury in *Dowling* had actually been advised of the prior acquittal. *See id.* at 345–46, 110 S.Ct. at 671. Notably, Appellant does not argue that evidence of his alleged involvement in Mr. Slafman's killing would not be admissible upon retrial.[3]

---

**2.** Appellant's jury-instruction challenge is based on *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994), a decision in which the Court described the asserted type of error as involving a "miscarriage of justice." *Id.* at 201, 638 A.2d at 963. This Court, however, has since effectively overruled *Huffman. See, e.g., Commonwealth v. Daniels*, 600 Pa. 1, 33–38, 963 A.2d 409, 429–32 (2009). In the circumstances, and in light of the abolition of relaxed waiver principles, *see Commonwealth v. Freeman*, 573 Pa. 532, 560–61, 827 A.2d 385, 402 (2003), the miscarriage-of-justice language employed in *Huffman* cannot displace ordinary issue-preservation requirements.

**3.** The potential collateral estoppel effect which may arise out of an acquittal is discussed in *Dowling*, 493 U.S. at 347–50, 110 S.Ct. at 671–73.

Again, his position is simply that he should now be accorded an opportunity to rebut the motive evidence with the fact of his acquittal.

In response, the Commonwealth catalogues its direct evidence of Appellant's crimes and seeks to minimize the role of the motive evidence. Indeed, according to the Commonwealth, even if Appellant was factually innocent of the killing of Mr. Slafman, after-discovered evidence of this would not be a basis for a new trial, given that it would not negate any element the Commonwealth was required to prove beyond a reasonable doubt. In this regard, the Commonwealth references *Commonwealth v. Small*, 559 Pa. 423, 437, 741 A.2d 666, 673 (1999) ("In order for after-discovered evidence to be exculpatory, it must be material to a determination of guilt or innocence.").

Moreover, the Commonwealth argues, the putative after-discovered evidence simply did not negate the evidence of motive. First, it is the Commonwealth's position that the concern of Arroyo members about the possibility that Mr. Figueroa might bear witness against them did not depend on the truth of the underlying accusation of criminal conduct. More practically, the Commonwealth explains that an acquittal is not proof of actual innocence. *Cf. Commonwealth v. Strand*, 464 Pa. 544, 547, 347 A.2d 675, 676 (1975) (explaining that inconsistent verdicts are generally tolerated in the judicial system); *see also* Brief for Appellee at 21 ("The acquittals mean no more than that that jury, presented with evidence decades after the crime, harbored a reasonable doubt."). In all relevant respects, the Commonwealth deems *McCall* to be dispositive. With reference to *Dowling*, the Commonwealth explains that the opinion does not hold that a future acquittal requires the overturning of a jury's verdict where the prosecution has presented evidence of a defendant's misdeeds, or even that a jury must necessarily be apprised of a preceding acquittal for such misdeeds. Rather, the Commonwealth notes, the *Dowling* Court merely observed that the issuance of an acquittal instruction provided some additional indicia that the evidence was properly admitted. *See Dowling*, 493 U.S. at

353, 110 S.Ct. at 674. The Commonwealth also emphasizes that the trial court provided cautionary instructions at Appellant's trial, advising the jury of the limited purpose for which the evidence of the murder of Mr. Slafman was admitted. *See* N.T., June 1, 1992, at 87–88.

Initially, we do not wholly agree with the Commonwealth's perspective regarding motive evidence. While such evidence may not go directly to any element of the crimes, prosecutors employ such proofs precisely because of the potentially persuasive effect in explaining and contextualizing human behavior. *See generally* 1 WHARTON'S CRIMINAL EVIDENCE § 4:45 (15th ed.2010) ("An inquiry as to motive is often of great importance, particularly in a case based largely on circumstantial evidence."). Nevertheless, here, it was never disputed that Mr. Figueroa was killed in the basement of the Colon residence in Appellant's presence and that Appellant, at the very least, assisted in concealing the victim's body. While we do not discount that motive served a significant role in the jury's determination of the degree of Appellant's participation, the above factors suggest more limited involvement than Appellant portrays.

In any event, we agree with the Commonwealth that, at least in the absence of an association strong enough to implicate the collateral estoppel effect referred to in *Dowling*, due process does not require a retrial upon a subsequent acquittal relative to motive-related criminal conduct. In this regard, the Commonwealth is correct that an acquittal is not the equivalent of factual innocence.[4] We are also cognizant of the problems of proof encountered by the Commonwealth when a retrial is delayed for more than a decade.

Here, Appellant has expressly refrained from arguing that evidence of his acquittal would be accorded any type of preclusive effect on a retrial. *See* Brief for Appellant at 23 ("It was not, and is not, the contention of Mr. Maisonet that evidence of his alleged involvement in the Slafman killing

---

4. We do bear in mind, however, the special significance which is attributed to acquittals. *See Commonwealth v. Reed*, 607 Pa. 629, 643–44, 9 A.3d 1138, 1147 (2010).

would not be admissible in a Figueroa re-trial."). While it very well may be that a trial judge would issue an acquittal instruction where the defense verdict relative to motivational crimes preceded the trial on other offenses, at least in the circumstances presented here and without more concrete justification than Appellant offers in his argumentation, we find that his subsequent acquittal does not necessitate a retrial. *Accord McCall*, 567 Pa. at 174–75, 786 A.2d at 196.

## IV. Asserted *Brady* Violation

█ Appellant next complains that, although the Commonwealth's opening trial witness, Jorge Rivera, identified Appellant as Mr. Slafman's killer, Rivera had previously testified (during the Pirela trial proceedings) that he was unable to identify any of the perpetrators of the robbery-homicide. Indeed, Appellant relates that he was awarded a new trial in the Slafman case for the very reason that his trial counsel failed to confront Rivera with this central inconsistency between his accounts. *See Commonwealth v. Maisonet*, Nos. 3477–3482, *slip op.* at 3–6, 1997 WL 1433742 (C.P.Phila., May 2, 1997). According to Appellant, the Commonwealth's failure to provide him with copies of the transcripts from the Pirela trials resulted in a denial of due process per *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and of his right, under the Sixth Amendment to the United States Constitution, to confront the witnesses against him with effective cross-examination. *See* Brief for Appellant at 27 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (plurality)).[5] In the alternative, Appellant

---

**5.** In this regard, Appellant misreads the salient passages of *Ritchie's* lead opinion. In fact, it indicates "the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Ritchie*, 480 U.S. at 53, 107 S.Ct. at 999 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (*per curiam*) (emphasis in original)). Since the Commonwealth's failure to supply Appellant with publicly available transcripts could not have impeded his opportunity for effective cross-examination, no further discussion of this facet of Appellant's claim is necessary.

charges his trial attorney with deficient stewardship in the failure to obtain and utilize the documents.

In response, the Commonwealth cites *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491 (1995), for the proposition that the government is not obliged to disclose evidence of which the defendant was aware and to which he had equal access. *See id.* at 509–10, 668 A.2d at 513. In this regard, the Commonwealth observes that the transcripts in question were from a public trial and were documents reposed with the court, rather than exclusively with the prosecution. Thus, the Commonwealth asserts, the transcripts were not singularly available to, much less withheld, by the Commonwealth, and, as such, simply were not *Brady* material. In terms of the ineffectiveness claim, the Commonwealth explains that such matters should be deferred to post-conviction review, where they may be considered on a developed evidentiary record. *See Commonwealth v. Grant*, 572 Pa. 48, 67, 813 A.2d 726, 738 (2002).

The Commonwealth's position, as related above, is correct. In accordance with the weight of the authority, publicly available transcripts of court proceedings are not *Brady* material. *See, e.g., United States v. Albanese*, 195 F.3d 389, 393 (8th Cir.1999) (finding no Brady violation in the government's failure to disclose a transcript of a witness's prior inconsistent testimony, since the document was in the public record); *Commonwealth v. Pursell*, 555 Pa. 233, 257, 724 A.2d 293, 305 (1999) ("The Commonwealth does not violate the *Brady* rule when it fails to turn over evidence readily obtainable by, and known to, the defendant."). Under *Grant*, Appellant's claim of deficient stewardship is appropriately deferred to the post-conviction stage. *See Grant*, 572 Pa. at 67, 813 A.2d at 738.

### V. America's Most Wanted Videotape

■ Appellant contends that the display by the prosecution of the America's Most Wanted videotape was completely unnecessary and deeply prejudicial. According to Appellant, the ostensible purpose—namely, to elaborate on the Commonwealth's efforts to locate Appellant—was amply achieved

through the testimony of prosecution witnesses. *See* Brief for Appellant at 34 ("Was it necessary to show to the jury a professionally acted and fictionalized re-enactment of the supposed sequence of events in order to demonstrate 'due diligence' by the Commonwealth?"). Appellant describes the tape as a "compilation of allegations," *id.* at 36, having no evidentiary value in relation to any issue in the case against him. His central position is that

> [t]he enormous prejudice inherent in such evidence should be intuitively grasped by any trial court considering the issue. Where the effect of such evidence, even if of marginal relevance, is to irreparably poison the waters of the trial and to tarnish the character of the defendant, as was true here, then such evidence should not be admitted, especially when the Commonwealth has other ways to proceed.

*Id.* at 37.

The Commonwealth, for its part, couches the videotape as "demonstrative evidence" and relies on the evidentiary purpose for which it was introduced, namely, to show the police efforts to find Appellant and, thus, to provide circumstantial evidence of his consciousness of guilt. The Commonwealth stresses the deferential abuse-of-discretion standard of review pertaining to trial-court evidentiary rulings. *See Commonwealth v. Spotz*, 562 Pa. 498, 520–21, 756 A.2d 1139, 1151 (2000). Further, it highlights the trial court's limiting instructions, the presumption that jurors will follow them, *see Commonwealth v. Tedford*, 598 Pa. 639, 700, 960 A.2d 1, 37 (2008), and trial counsel's repeated expressions of satisfaction with the instructions, *see* N.T., June 3, 1992, at 139; N.T., June 9, 1992, at 79. The Commonwealth also indicates that the prosecutor took pains to alleviate any prejudice on account of extraneous references, for example, by ensuring that such references were dubbed from the audiotrack. *See* N.T., June 3, 1992, at 138–39. The Commonwealth also comments that the jurors already were well aware of Appellant's gang involvement, the issuance of a federal warrant, and his eventual capture in Puerto Rico. Moreover, the Commonwealth explains that Appellant did not object at trial to the admission of the

edited videotape on any of these bases, so that they cannot furnish him with a basis for relief on direct appellate review for trial errors. Finally, the Commonwealth also references *Commonwealth v. Serge*, 586 Pa. 671, 896 A.2d 1170 (2006), for the proposition that demonstrative evidence is admissible where it fairly and accurately represents that which it purports to depict. According to the Commonwealth, any inconsistencies between the video portrayals and actual events affect the weight, not the admissibility, of the evidence.

Initially, the Commonwealth's citation to *Serge* is not well placed. *Serge* involved the admission of a computer generated graphic portraying the Commonwealth's theory of how a killing occurred. Significantly, this Court's decision approving the admission of such evidence relied, in material part, upon the authentication of the graphic, in terms of testimony by expert witnesses concerning how it was made and derived from the Commonwealth's forensic evidence. *See id.* at 686–87, 896 A.2d at 1179–80. Additionally, the Court highlighted that the presentation minimized extraneous graphics and information. *See id.* at 690, 896 A.2d at 1182. In terms of prejudice, the Court observed that the graphic did not include sounds; facial expressions; evocative or even life-like movements; transition between the scenes to suggest a story line or add a subconscious prejudicial effect; or evidence of injury such as blood or other wounds. *See id.* at 692, 896 A.2d at 1183. Certainly, dramatizations appear on the America's Most Wanted videotapes with which this Court has been provided that represent the antithesis of the computer generated graphic at issue in *Serge*.[6] Indeed, it is quite apparent that the unedited videotapes, at least, contain material which would have had no place at Appellant's trial.

One principal difficulty, however, is the unavailability of the edited tape that was played to the jury. Although Appellant claims the actor portrayals were put before the jury, he offers

6. For example, the videotape provided by the Commonwealth shows actors portraying Appellant and cohorts robbing the restaurant, with the actor portraying Appellant acting as the leader and raising a rifle and shooting Mr. Slafman. Sounds, facial expressions, life-like movements, transitions, and suggestions of injury are prolifically evident.

no evidence to that effect. Moreover, the record reflects that the Commonwealth used the same edited videotape at the Figueroa trial as was entered into evidence at the initial Slafman trial, *see* N.T., June 3, 1992, at 138–39; there is a recorded transcript from the Slafman proceedings, *see Commonwealth v. Maisonet*, Nos. 3477–3482, 1997 WL 1433742 (C.P.Phila., May 1992) (transcription of videotape); and such record does not reflect the dramatic portrayals.[7]

The other main difficulty is that Appellant's trial attorney lodged a very limited objection to the display of the videotape and repeatedly expressed satisfaction with the trial court's limiting instructions. *See* N.T., June 3, 1992, at 139; N.T., June 9, 1992, at 79. As such, Appellant's claims of pervasive prejudice are unpreserved. Thus, while we recognize that there is much visceral force to Appellant's arguments, at least to the degree that the actual dramatic portrayals were displayed to the jury, these contentions are not cognizable as direct claims of trial court error.

## VI. Statutory Review

At this juncture, we are required to affirm Appellant's sentence of death unless we find that the death sentence was the product of passion, prejudice or any other arbitrary factor, or that the Commonwealth's evidence does not support at least one of the aggravating factors. *See* 42 Pa.C.S. § 9711(h)(3).[8]

With regard to the passion-prejudice prong, we are deeply troubled by the display of the America's Most Wanted videotape to the jury, particularly in light of the loss of the

7. The transcript correlates with narrative portions from the shows and a few police interviews. *See id.*

8. Although Appellant's conviction for first-degree murder in a period in which the Court also was required to undertake proportionality review, *see* 42 Pa.C.S. § 9711(h)(3)(iii) (repealed), the requirement for such review was eliminated prior to the trial court's imposition of Appellant's death sentence. *See Commonwealth v. Laird*, 605 Pa. 137, 185, 988 A.2d 618, 647 (2010) (explaining that "the 'operative event' that triggers entitlement to proportionality review under Pennsylvania's capital sentencing scheme is the imposition of a death sentence, not the offense itself").

videotape by the court system which has foreclosed a definitive appreciation of what portions were shown to the jurors. Again, it is plain that substantial portions of the unedited tape, at least, are materially prejudicial. Since, however, we cannot decisively discern which portions were played to the jury, we are unable to rely on the videotape as a basis for a finding of passion, prejudice, or an arbitrary factor. In the circumstances, according to the terms of the death-penalty statute, and upon a review of the record as a whole, we are required to affirm.

In terms of aggravation, at the very least, the record supports the finding of a previous voluntary manslaughter conviction. *See* N.T., June 11, 1992, at 16–17.[9]

## VII. Holding and Directions

The judgment of sentence is affirmed, and the Prothonotary is directed to transmit the reconstituted record of this case to the Governor of Pennsylvania in accordance with Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i).

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, and McCAFFERY join the opinion.

---

**9.** We realize that the aggravating circumstance pertaining to Appellant's conviction for the murder of Mr. Slafman was undermined by the later award of relief in the form of a new trial, followed by an acquittal. Nevertheless, in a situation where a jury has found at least one extant aggravator and no mitigation, a verdict of death is required in any event. *See* 42 Pa.C.S. § 9711(c)(1)(iv); *see, e.g., Commonwealth v. King*, 554 Pa. 331, 374, 721 A.2d 763, 784–85 (1998).