# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

## SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 699 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on 5/9/13 in the Court of |
| | : | Common Pleas of Westmoreland |
| v. | : | County, Criminal Division at No. CP-65- |
| | : | CR-0001991-2010 |
| KEVIN MURPHY, | : | |
| | : | |
| Appellant | : | ARGUED:  October 6, 2015 |
| | : | RESUBMITTED:  January 20, 2016 |

## *OPINION*

**MR. CHIEF JUSTICE SAYLOR**                **DECIDED:  March 29, 2016**

This is a capital direct appeal.

On April 23, 2009, in Loyalhanna Township, Westmoreland County, Appellant shot and killed his mother, Doris Murphy, his sister, Kris Murphy, and his aunt, Edith Tietge.  He was charged with multiple counts of murder, and the Commonwealth tendered notice of its intention to pursue the death penalty.  In a trial before a jury in 2013, Appellant was convicted of the first-degree murder of each of the victims; the jurors returned a death verdict in the ensuing penalty proceedings.[1]  Appellant pursued post-sentence relief in the trial court, which was denied, and this direct appeal followed.

---

[1] It appears that the jury considered the imposition of the death penalty relative to the victims on a unitary basis.  In imposing sentence, the trial court attached the death verdict to the killing of Doris Murphy and imposed life sentences based on the
(continued…)

## I. Evidentiary Matters

Three of the five challenges to the judgment of sentence presently raised by Appellant center on the adequacy of the Commonwealth's evidence of his guilt. Initially, there is no question that most of the elements of first-degree murder are established relative to the obviously intentional and malicious killings of Appellant's family members. *See generally Commonwealth v. Maisonet*, 612 Pa. 539, 546, 31 A.3d 689, 693 (2011) (explaining that, to obtain a first-degree murder conviction, the Commonwealth must prove that: a human being was unlawfully killed; the defendant was the killer; and the defendant acted with malice and a specific intent to kill (citing, *inter alia*, 18 Pa.C.S. §§2501, 2502(a))).[2] Appellant claims, however, that the Commonwealth failed to demonstrate, adequately, his identity as the killer.

At trial, the Commonwealth proceeded on the theory that Appellant's motive for murdering his family members was to eliminate difficulties deriving from their disapproval of Appellant's romantic relationship with a married woman, Susan McGuire, whom Appellant wished to bring to live at his residence. *See, e.g.*, N.T., Apr. 24, 2013, at 473-74, 501-03; N.T., Apr. 26, 2013, at 835-838. By way of some elemental background, it is undisputed that Appellant, his mother (Doris), and his sister (Kris) lived together, and that Kris was an employee at Appellant's business, Ferguson Glass, where Doris and Appellant's aunt (Edith) volunteered. Of further significance to the

---

(…continued)
convictions for the other two murders. No issues are presently raised concerning this approach.

[2] At trial, the Commonwealth presented undisputed testimony from a pathologist confirming both the cause and manner of the deaths, in which each of the three victims was shot in the head. *See* N.T., Apr. 29, 2013, at 979-1015.

case, the business premises was adjacent to a farm owned by Appellant's uncle, Roy Martin, where Appellant assisted with the farm work.

The prosecution presented testimony from John Krivascy, a friend of Appellant's, who explained that, a few months prior to the killings, Appellant called seeking advice about acquiring a gun, explaining that he wished to shoot groundhogs. *See* N.T., Apr. 25, 2013, at 534.

Commonwealth witness Charles Modrey, who was Appellant's neighbor, testified that shortly before the day of the murders, Appellant had related that he had a "girlfriend that was coming" to his residence, but that Doris and Kris disapproved. *Id.* at 548. Furthermore, according to Mr. Modrey's account, Appellant proceeded to inquire whether the witness knew anyone who could help "get rid of his problem." *Id.* at 550.

Evidence was adduced to the effect that, in the days immediately before the killing, a .22 caliber pistol owned by Appellant was brought to the Ferguson Glass business premises, although no firearm had otherwise ever been kept there. *See* N.T., Apr. 23, 2013, at 281-85.[3] Witnesses testified that, subsequently, Appellant gave varied accounts to explain why the weapon was present. *See, e.g.*, N.T., Apr. 24, 2013, at 470 (reflecting testimony from an investigating officer that Appellant had indicated that the handgun was present for protection); *id.* at 472 (reflecting another officer's testimony that Appellant had said that the pistol was taken to the premises so that he could shoot a raccoon that had been trapped on the farm premises).[4]

---

[3] Appellant's sister, Kris, physically carried the firearm into the building. *See id.*

[4] In terms of the account of the raccoon, the evidence showed that such an animal recently had been caught in a trap on the farm premises. On cross-examination in the defense case, however, Appellant's uncle explained that he had killed it with a rifle that he owned and maintained on the farm premises. *See* N.T., Apr. 30, 2013, at 1283-84.

The Commonwealth showed that, during the morning of April 23, 2009, Appellant told an employee that he was "shooting at birds and got a gun burn on his hand." N.T., Apr. 24, 2013, at 325-326, 332-333.

The prosecution further established that, on that day, Susan McGuire was served with divorce papers and that she and Appellant communicated. *See id.* at 474; N.T., Apr. 29, 2013, at 1053-1054; *accord* N.T., May 2, 2013, at 1658 (reflecting Appellant's testimony during the defense case that Susan McGuire had called in the afternoon on April 23, 2009, and said that she had been served with divorce papers).

The Commonwealth also presented evidence that, that afternoon, Appellant took measures to keep other individuals away from the Ferguson Glass business premises. For example, a hunter who normally parked at the entranceway to the Martin farm (which, again, was adjacent to the glass business) related to the jury that Appellant had authorized him to drive across a portion of the Martin farm over which the hunter normally walked. *See* N.T., Apr. 24, 2013, at 373-374. Around four o'clock in the afternoon, Appellant called a driver who was on his way to deliver glass to inquire as to his anticipated arrival time. *See id.* at 359.[5]

Upon returning from an animal auction in the early evening, Mr. Martin discovered the victims' bodies in the Ferguson Glass shop and summoned Appellant from the farm. *See id.* at 407. When ambulance personnel arrived, Appellant, in his words, was "worked up," and he was taken to the hospital. *Id.* at 408.[6]

---

[5] Mr. Martin also testified, during cross-examination in the defense case, that Appellant had told him to stay at an animal auction that afternoon until a cow that Mr. Martin had brought was sold. *See* N.T., Apr. 30, 2013, at 1237. He also acknowledged that he may have told police previously that Appellant had said to stay until the auction concluded. *See id.* at 1293-94.

[6] The Commonwealth presented evidence that Appellant was feigning a panic attack to gain time to collect his thoughts. *See* N.T., Apr. 26, 2013, at 856.

Law enforcement officers testified that, in their interviews with Appellant at the hospital, he repeatedly indicated that an employee was present when he purportedly had shot at a bird. *See* N.T., Apr. 24, 2013, at 412, 427, 460. When confronted with the employee's denial of this assertion, Appellant merely said "well, I thought he was." *Id.* at 427. An investigating officer testified that Appellant told him that the pistol had been on the premises for several weeks, *see id.* at 410, when, in fact, it had been brought to the premises only a few days before. The officer related that Appellant said that, after shooting the handgun at a bird, he placed the firearm in a Tupperware container on a shelf in a storage room and that no one else knew that the weapon had been left in such location. *See id.* at 412, 518.

The lead investigator examined Appellant's finger but did not see any burn. *See id.* at 459-60. Appellant gave inconsistent accounts about where he put empty shell casings after having shot at a bird. *Compare id.* at 505 (reflecting testimony of one investigator that Appellant told her that he threw the shells in a dumpster), *with* N.T., Apr. 25, 2013, at 564-567 (reflecting another officer's attestation that Appellant said that he threw the shell casings over a steep hillside). Further, evidence was adduced to the effect that police were unable to locate shells in either place. *See* N.T., Apr. 29, 2013, at 1031-1032.

In the ongoing police investigation, no sign of forced entry into the Ferguson Glass premises was found; moreover, Doris Murphy's purse, containing several hundred dollars, remained on a countertop. *See* N.T., Apr. 23, 2013, at 138, 167, 233. Investigators discovered the pistol used in the killings in a catch-basin to a belt sander. *See id.* at 260.

A forensic DNA supervisor testified that Appellant's DNA was present on the handgun. N.T., Apr. 25, 2013, at 681-682. Another analyst confirmed the presence of

gunshot residue on Appellant's hand deriving from a test taken soon after the killings. *See* N.T., Apr. 26, 2013, at 768.

The Commonwealth also presented testimony of Appellant's confession, after his arrest, to a fellow prisoner at Westmoreland County Prison, John Meighan. According to Meighan, Appellant admitted that he planned and executed the three murders per the request of Susan McGuire. *See id.* at 850-855. Meighan testified that Appellant had also confided to him that Susan McGuire had advised Appellant to fire the handgun earlier in the day while being observed by an employee. *See id.* at 853.[7]

Appellant testified in his own defense, denying any participation in the killings. On cross-examination, however, he admitted to various omissions and lies in his statements to police investigators. *See, e.g.*, N.T., May 1, 2013, at 1597-1603, 1610, 1618-1619. He also presented testimony from an emergency medical technician to the effect that his blood pressure and heart rate were elevated when he was taken to the hospital, and he was flushed and sweating profusely. *See id.* at 1378. An inmate from Westmoreland County prison gave testimony suggesting that Meighan had learned details concerning Appellant's circumstances from news media. *See id.* at 1403-1405. A firearms examiner attested that it was possible to be burned by the type of handgun involved in the killings. *See id.* at 1477. Roy Martin also offered his account of the events on April 23, 2009, with particular emphasis on an explanation for why he remained at the auction until it concluded, while denying on cross-examination that Appellant told him to do so. *See* N.T., Apr. 30, 2013, at 1168-1173, 1293-1294. Mr. Martin further indicated that his family had encountered difficulties in the past with Mr.

---

[7] Presumably, the intent was to account for any physical evidence of Appellant's contact with the weapon that day. *Accord* N.T., Apr. 26, 2015, at 854 (reflecting Meighan's testimony that the purpose was to use the employee "as an alibi that he was handling the gun that morning").

Modrey. *See* N.T., Apr. 30, 2013, at 1144. Finally, the defense presented several character witnesses.

In the first of his three claims centered on the adequacy of the Commonwealth's evidence, Appellant contends that the verdicts were against the weight of the evidence. He indicates that there was very little physical evidence presented by the prosecution, some of which, from his perspective, was equally consistent with his innocence. *See, e.g.*, Brief for Appellant at 86 ("While DNA evidence and gun residue analysis indicated [Appellant] fired, handled, or was in close proximity to the revolver when discharged, it is hardly surprising for a gun owner to handle his gun."). In terms of the physical evidence, Appellant also highlights the presence of DNA from an unknown individual on the murder weapon.

Appellant suggests that the Commonwealth's case rested primarily on the testimony of Charles Modrey and John Meighan. As to Mr. Modrey, Appellant observes that the witness had not related to police his account of Appellant's desire to eliminate a problem until a year after the murders and that the witness was known to have had difficulties with Appellant and his family. *See* N.T., Apr. 25, 2013, at 553. Appellant also describes the content of the conversation related by Mr. Modrey as "innocuous" and postulates that the witness may have been confused. Brief for Appellant at 88.

Regarding Meighan, Appellant attacks his testimony as "self-serving and contrived." *Id.* at 89. After enumerating Meighan's *crimen falsi* convictions, Appellant pronounces that such witness's testimony was and is entitled to "no weight." *Id.* It is Appellant's position that this Court should contrast such evidence "with the heavy evidence of [Appellant] getting along with and being protective of his family; being highly emotional at the scene and being given Valium to calm down; and the 911 audio of

[Appellant] acting hysterically in the background." *Id.* In light of this summary, Appellant asserts that "[t]he great weight of the evidence supports [Appellant's] non-guilt." *Id.*

The Commonwealth responds with emphasis on the prevailing review standard, which relegates weight-of-the evidence considerations to the finder of fact, in the first instance, and then to the discretion of the trial court which had the opportunity to hear and see the evidence presented. *See, e.g., Commonwealth v. Widmer*, 560 Pa. 308, 319-20, 744 A.2d 745, 753 (2000). The Commonwealth explains that, to grant a new trial based on weight-of-the-evidence concerns, it must appear that "the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *In re J.B.*, ___ Pa. ___, ___, 106 A.3d 76, 95 (2014) (quoting *Commonwealth v. Lyons*, 622 Pa. 91, 116, 79 A.3d 1053, 1067 (2013)).

In addressing the trial proofs, the Commonwealth highlights the motive evidence concerning Appellant's desire to live with Susan McGuire at his residence and the victims' disapproval of the relationship; the conveyance of Appellant's pistol to the Ferguson Glass premises in close proximity to the murders for reasons Appellant was unable to explain consistently; the fact that this weapon then was used to perpetrate the killings; Appellant's exclusive knowledge of the location of the firearm prior to the murders; Mr. Modrey's testimony that Appellant wished to solicit assistance in eliminating his problem with his relatives; and Meighan's depiction of Appellant's jailhouse confessions. In the totality, and considered in light of the defense case, the Commonwealth maintains that there simply is nothing relative to the guilty verdicts that shocks the conscience.

Upon our review, we agree with the Commonwealth's position. As previously explained, disturbance of a jury verdict on weight-of-the-evidence grounds would be appropriate only in an exceptional case where the evidence weighs very heavily against

the conviction. Here, however, per the trial court's review of the record, and ours, we do not find that the jury lost its way or embarked upon a manifest miscarriage of justice by convicting Appellant on the three counts of first-degree murder. In terms of Meighan's testimony, the jurors were made aware of the witness's entanglements in the criminal justice system, including his *crimen falsi* convictions, *see* N.T., Apr. 26, 2013, at 879-80, he was subject to extensive cross-examination, *see id.* at 884-943, and Appellant's counsel took pains to cast suspicion upon the testimony in his closing remarks, *see, e.g.*, N.T., May 3, 2013, at 1720-1721. Furthermore, the jurors were entitled to treat Appellant's admitted omissions and lies in his statements to police as evidence of his consciousness of guilt. *See Commonwealth v. Williams*, 532 Pa. 265, 275, 615 A.2d 716, 721 (1992). Moreover, the Commonwealth presented a collage of other evidence supporting a finding of Appellant's guilt, and, thus, the matter was properly for the jury. Accordingly, the trial court did not abuse its discretion in denying relief on Appellant's weight-of-the-evidence claim.

The remaining challenges to the adequacy of the Commonwealth evidence fall within the category of evidentiary sufficiency. Again, the establishment of most of the elements of first-degree murder is manifest and undisputed, and the sole controversy is over proof of identity. As such, our analysis of evidentiary sufficiency overlaps materially with the weight-of-the evidence review set forth above. Viewed in its totality, we find, the Commonwealth presented sufficient evidence to enable a reasonable jury to find all elements of the crimes of first-degree murder beyond a reasonable doubt. *See Commonwealth v. Reed*, 605 Pa. 431, 436, 990 A.2d 1158, 1161 (2010) (setting forth the prevailing review standard governing sufficiency claims).

Appellant advances one additional sufficiency argument, grounded upon the aspirational goal in the capital arena to a heightened standard of reliability in fact-finding procedures, given the severity of the penalty of death. *See Ford v. Wainwright*, 477 U.S. 399, 411, 106 S. Ct. 2595, 2602 (1986) ("In capital proceedings …, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability."). In particular, Appellant contends that, because a majority of the evidence presented by the Commonwealth at trial was circumstantial, the need for "heightened reliability" in capital cases precludes the imposition of a death sentence here and instead necessitates that we vacate and remand for entry of a sentence of life in prison without parole.

Appellant has not developed his argument adequately for this Court to contemplate granting the requested relief. Appellant does not deny that the jury applied the applicable standard of proof, namely proof beyond a reasonable doubt, in both the guilt and penalty phases of his trial. He likewise cites to no authority preventing or limiting the use of circumstantial evidence in any phase of capital proceedings, or otherwise requiring more or greater proof than that required to satisfy the "beyond a reasonable doubt" standard when circumstantial evidence is presented in any phase. As such, he provides us with no basis to vacate the judgment of sentence.

## II. Suppression

Appellant claims that the suppression court erred in denying his pretrial motion to exclude from evidence his statements to police made while at the hospital and, later, at a police station, given that he was under the influence of a powerful medication and labored under emotional distress. He asserts that he suffered a panic attack after encountering the bodies of his family members, as evidenced by the fact that an emergency medical technician found him to be flushed and perspiring profusely and

recorded his elevated heartbeat and blood pressure readings. Additionally, Appellant relies on testimony from a psychiatrist, Christine Martone, M.D., that he presented at a suppression hearing. In this regard, Dr. Martone testified that the effect of Appellant's panic attack, coupled with an administration of five milligrams of Valium while being transported to the hospital, deprived Appellant of the ability, subsequently, to knowingly, voluntarily, and intelligently make statements or give consent. *See* N.T., Apr. 30, 2013, at 13.

Appellant also highlights that law enforcement officers failed to consult with medical personnel before interviewing him. Further, he points to anecdotal observations during the interviews that he tended to look down or away, to speak only when prompted, and to appear emotionless as supportive of the psychiatrist's opinion. As an overview, Appellant relates that he:

> was in the embarrassing position of wearing a hospital gown, not having access to his house, and having no transportation to get home, he was subjected to multiple interviews by several troopers over a 10-hour period, was confronted with another's statement which contradicted his statement in one respect, and was in the presence of at least one officer shortly after 9:00 p.m. on April 23, 2009 until he arrived home after 7:00 a.m. on April 24, 2009.

Brief for Appellant at 85. In the totality, he complains of "coercive conduct and deliberate ignorance of [Appellant's] medical condition." *Id.*

Appellant's reliance on Dr. Martone's opinion at this stage of the proceedings, however, is in derogation of the applicable standard on appellate review pertaining to denial of a suppression motion, pursuant to which we consider only so much of the defense evidence as remains uncontradicted. *See, e.g., Commonwealth v. Johnson*, 615 Pa. 354, 374, 42 A.3d 1017, 1028 (2012).

At the suppression hearing, each of several interviewing officers testified to Appellant's calmness, cooperativeness, alertness, coherency, and ability to render extensive oral and written accounts throughout the process. *See, e.g.*, N.T., Aug. 15, 2011, at 46-50. Each of the investigators testified to his or her experience with individuals under the influence of controlled substances and to his or her observation that Appellant did not appear to be so affected. *See, e.g.*, *id.* at 82. They also confirmed the regularity of the interview processes, including the fact that Appellant was treated in a professional fashion and not subjected to coercive measures (other than encountering mere expressions of disbelief relative to a few of his responses). Such testimony was credited by the suppression court, *see* Opinion and Order dated Oct. 7, 2012, in *Commonwealth v. Murphy*, No. 1991 C 2010, *slip op.* at 16-20 (C.P. Westmoreland), and presents an adequate basis for denial of a suppression motion premised on a claim that statements and consents were not knowing, voluntary, and intelligent. *Accord Commonwealth v. O'Bryant*, 479 Pa. 534, 540, 388 A.2d 1059, 1062 (1978). Furthermore, the suppression court was not obliged to believe the forensic psychiatric opinion presented by Appellant.

Based on the above, we conclude that the suppression court did not abuse its discretion or otherwise err in denying Appellant's motion to exclude evidence of his statements.

### III. Penalty

In Appellant's final argument, he asserts that, because the aggravating circumstances found by the jury in the penalty proceedings overlapped,[8] the jury impermissibly "double-count[ed]" the aggravation. Brief for Appellant at 72.

---

[8] The aggravators in question are set forth in Sections 9711(d)(10) and (11) of the Sentencing Code. *Compare* 42 Pa.C.S. §§9711(d)(10) (designating as an aggravating
(continued…)

As a preliminary observation, we note, however, that "counting" of aggravators is relevant only for purposes of the initial eligibility process, in which eligibility for the death penalty is established upon the finding of any single aggravator. *See* 42 Pa.C.S. §9711(c)(iv). The remaining assessment, if mitigation also is found, entails a weighing -- not a counting -- process. *See, e.g., Commonwealth v. Reyes*, 600 Pa. 45, 53-54, 963 A.2d 436, 441-42 (2009). Notably, the jury at Appellant's trial was so instructed, consistent with the governing law. *See* N.T., May 7, 2013, at 238.

In any event, as the Commonwealth observes, Appellant did not lodge a relevant objection at trial and, therefore, any residual concerns about this issue must await post-conviction review. *See* Pa.R.A.P. 302(a).

## IV. Statutory Review

At this stage, we are required to affirm Appellant's capital judgment of sentence unless we find it to have been the product of passion, prejudice, or any other arbitrary factor, or that the Commonwealth's evidence does not support at least one aggravating factor. *See* 42 Pa.C.S. §9711(h)(3). After reviewing the record, we are persuaded that the sentence imposed upon Appellant was not the product of passion, prejudice, or any other arbitrary factor, but rather, resulted from the evidence that Appellant deliberately and maliciously killed the victims, as well as the jurors' appropriate service of their function in capital litigation per the governing statutory scheme. Finally, the evidence plainly established both aggravating circumstances found by the jury, given the multiple killings involved. *See supra* note 8.

---

(…continued)
circumstance conviction of an offense for which a sentence of life imprisonment or death was imposable), *with id.* §9711(d)(11) (specifying that conviction of another murder before or at the time of the offense in issue constitutes an aggravating circumstance).

The judgment of sentence is affirmed, and the Prothonotary is directed to transmit the record to the Governor in accordance with Section 9711(i) of the Sentencing Code, 42 Pa.C.S. §9711(i).


Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Wecht did not participate in the consideration or decision of this case.