84 A.3d 635

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Patrick Jason STOLLAR, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 2011.

Decided Jan. 21, 2014.

Kenneth A. Snarey, Esq., for Patrick Jason Stollar.

Michael Wayne Streily, Esq., Nicole Thomas Wetherton, Esq., Allegheny County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

McCAFFERY, Justice.

This is a capital direct appeal from judgments of sentence imposed by the Court of Common Pleas of Allegheny County on March 24, 2008. Because we conclude that the reviewable issues raised by Appellant's appeal are without merit, sufficient evidence supports the verdict, and the sentence of death was not arbitrarily imposed or the product of passion or prejudice, we affirm the judgments of sentence.

The relevant facts of this case are as follows. Seventy-eight-year-old Jean Heck was found by her neighbors lying dead in a pool of blood in her house in Upper St. Clair Township, on June 4, 2003. She had been beaten, strangled, stomped upon, and stabbed. Prior to the discovery of Ms. Heck's body, one of the neighbors saw a man leave Ms. Heck's house and drive away in a newer model vehicle. She later identified this individual in a police photo array as Appellant, Patrick Jason Stollar.

After police investigators arrived on the scene, they discovered that Ms. Heck's purses did not contain any cash, credit cards, identification, or checkbooks and that they appeared to have been rifled through. The police also discovered a piece of paper on the kitchen counter that had written upon it an address and telephone number, which were shortly deter-

mined to be the address and telephone number of Appellant's mother. It was later discovered that during the time the police were investigating the scene at the victim's house on June 4, 2003, Appellant was at his bank unsuccessfully attempting to cash a check drawn from the victim's account, purportedly executed by the victim, and made payable to him in the amount of $4,000. The next day, Appellant attempted to cash a second check drawn from the victim's account, again purportedly executed by the victim, and made payable to him in the amount of $2,500.

Based upon the address discovered at the scene and other evidence, the police searched for Appellant at his former place of employment, where a co-employee informed the police that Appellant was staying at her apartment with her and her then-fiance. The co-employee signed a consent form for the police to search the apartment. Upon arriving at the apartment, the police observed Appellant running toward the bathroom and attempting to hide. The police told him that they wished to speak with him in the hallway. Appellant consented, and upon reaching the hallway, he suddenly declaimed, "I killed that woman, I murdered that woman." Trial Court Opinion, dated 6/28/10, at 9.

After Appellant was arrested for the murder of Ms. Heck and given his *Miranda* warnings, he voluntarily made a statement to the police, which was taped. In this statement, Appellant confessed to the murder, providing details of the crime and further telling the police that he had gone to the victim's house with the intent of robbing and killing her. Appellant additionally told the police that he had buried the clothing he had worn during the crime, the knife he had used to stab the victim, and certain items he had stolen from the victim's purses. On June 6, 2003, Appellant took the police to the site where he had buried the aforementioned items. At the site, the police recovered the knife used to stab the victim, blood-spattered clothing, blood-covered tissues that corroborated Appellant's statement that he had wiped blood from the knife with tissues taken from the victim's house, the victim's checkbook, a wallet containing the victim's driver's license,

and several credit cards that belonged to the victim. Later, Appellant provided another taped confession to the police that corroborated his earlier statements.

Appellant was charged with one count of criminal homicide and received notice that the Commonwealth would be seeking the death penalty based on the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(6) (the defendant committed a killing in the perpetration of a felony). With respect to the latter, Appellant was also charged with one count each of robbery, burglary, and theft by unlawful taking, and with two counts of forgery. Counsel was appointed to represent Appellant. At time of trial, Appellant's stand-by counsel for the guilt phase was Robert L. Foreman, Esq., and his penalty-phase counsel was James E. DePasquale, Esq. A forensic social worker was also appointed to aid in Appellant's defense. Thereafter, the Commonwealth notified Appellant and the trial court that it intended to present victim impact evidence from eight witnesses during the penalty phase of trial.

A series of pre-trial proceedings, including some concerning Appellant's mental health and competency, occurred. Hearings were held on April 24, April 26, and May 1, 2006, regarding Appellant's desire to plead guilty. On May 1, 2006, following an extensive colloquy with the court and counsel, Appellant pled guilty to first-degree murder and the other charges. The very next day, however, another hearing was held at which the court granted Appellant leave to withdraw his guilty pleas. Appellant had apparently made what appeared to be a suicide attempt the evening before.[1] On May 18, 2006, Appellant was ordered by the trial court to be committed for involuntary mental health treatment.

After Appellant had undergone his course of treatment, on October 3 and October 10, 2006, the trial court held hearings regarding Appellant's request to represent himself at the guilt phase of trial. Colloquies were conducted with Appellant on

1. However, Appellant was able to appear at the May 2, 2006 hearing, and informed the court that he was withdrawing his guilty pleas because he "had a change of heart." Notes of Testimony, Pre–Trial Proceedings, 5/2/06, at 213.

both dates, and an examining psychiatrist testified that Appellant's decision to waive representation and to proceed *pro se* was made knowingly, intelligently, and voluntarily. Following these hearings, the trial court determined that Appellant was competent to waive his right to the assistance of counsel. However, following additional hearings, including one on April 17, 2007, where an examining psychiatrist testified regarding her observations of Appellant, the court determined that Appellant was not competent to stand trial. On April 18, 2007, Appellant was once again committed for involuntary mental health treatment.

Thereafter, on July 19, 2007, and upon motion of the Commonwealth, the trial court entered an order: (1) providing that the warden of the Allegheny County Jail place Appellant in isolation in its mental health unit and maintain a constant suicide watch; (2) providing that the warden monitor Appellant's ingestion of prescribed medication and immediately inform the court if Appellant failed to take his medication; (3) authorizing the Commonwealth to conduct an independent psychiatric evaluation of Appellant by its expert witness at any time Appellant's competency was called into question until the termination of the case; and (4) requiring that the institutions that have already treated or evaluated Appellant for mental health issues provide relevant medical records to the Commonwealth for review by its expert witness.

On November 5, 2007, a pre-trial conference was held, at which time Appellant, following a colloquy with the court, once again asserted his right to represent himself at the guilt phase of his trial. Thereafter, Appellant filed a *pro se* petition indicating his intent to pursue a diminished capacity defense.

*Voir dire* commenced on January 30, 2008, and Appellant's jury trial began on February 12, 2008. During the guilt phase of his trial, Appellant acted as his own counsel. On February 20, 2008, the jury found Appellant guilty of all charges. On February 22, 2008, following the penalty phase of Appellant's trial, during which he was represented by counsel, the jury determined that the aggravating factor of homicide committed

during the course of a commission of a robbery or burglary[2] outweighed the two mitigating factors found by the jury (Appellant's life history and his character[3]) and, accordingly, sentenced Appellant to death. Appellant was formally sentenced to death by the trial court on March 24, 2008. At that time, he was also sentenced to ten to twenty years' imprisonment for robbery, consecutive to his death sentence, and an additional ten to twenty years' imprisonment for burglary, consecutive to the robbery sentence.

Ken Snarey, Esq. was appointed to represent Appellant and filed post-sentence and then amended post-sentence motions. A post-sentence hearing was held on June 30, 2009, at which Appellant's penalty-phase counsel, James E. DePasquale, testified. On July 2, 2009, the trial court denied Appellant's post-sentence motions. Appellant then timely filed the instant direct appeal to this Court, raising three issues for our review.[4]

## Sufficiency Review

"In all capital cases[,] this Court has a self-imposed duty to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction. In conducting this review, we must view the evidence, and all

2. 42 Pa.C.S. § 9711(d)(6).

3. Each, 42 Pa.C.S. § 9711(e)(8).

4. Appellant's issues, set forth verbatim, are as follows:
   1. Whether the trial court erred in forbidding Defendant to testify during the guilt phase unless he either testified in a self-question-and-answer method or waive his right to self-representation and have a standby counsel question Defendant?
   2. Whether Attorney DePasquale was ineffective in failing to object to the admission of irrelevant, unduly prejudicial, and otherwise inadmissible victim impact testimony—specifically, opinions of family regarding the crime, Defendant as a person, and the appropriate punishment?
   3. Whether Attorney DePasquale was ineffective for not requesting that the jury be instructed to consider whether the mitigating factor of emotional disturbance was established by the guilt-phase testimony of Carol Johnston, Ph.D., and Stuart Burstein, M.D. and, if established, consider that factor in determining the penalty to impose for the First–Degree Murder conviction?
   Appellant's Brief at 4.

reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict-winner and determine whether the jury could have found every element of the crime proven beyond a reasonable doubt." *Commonwealth v. Chamberlain*, 612 Pa. 107, 30 A.3d 381, 393–94 (2011) (citations omitted).

Here, in order to sustain Appellant's first-degree murder conviction, we must be able to conclude that the evidence proved beyond a reasonable doubt the following three elements: (1) that the victim was unlawfully killed; (2) that Appellant is responsible for the killing; and (3) that Appellant acted with malice and a specific intent to kill. *See Commonwealth v. Maisonet*, 612 Pa. 539, 31 A.3d 689, 693 (2011). The killing must have been committed in a willful, deliberate, premeditated way. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 615 (2010). We have reviewed in detail the notes of testimony from Appellant's trial in order to determine if the evidence was sufficient to establish these elements. As summarized in the following paragraphs, the evidence in support of Appellant's guilt of the first-degree murder of the victim was not merely sufficient, but compelling.

Susan Schneid, one of Jean Heck's neighbors, testified that on the afternoon of June 4, 2003, she was inside her house cleaning when she heard two distinct, simultaneous screams coming from Ms. Heck's property, which was situated across the street from her property. Notes of Testimony ("NT.") Trial, 2/12/08, at 50. Thereafter, she heard noise "like a little scuffle ... like a stomping sound." *Id.* at 51. Ms. Schneid observed a newer-model, two-door Ford Expedition or Explorer parked in the victim's yard, and some minutes after hearing the "scuffle" noise, saw a clean-cut looking man walk down the property's path, get into the vehicle, and drive casually away. *Id.* at 53–54; 57. Ms. Schneid later identified this man from a police photo array as Appellant. *Id.* at 71.

Being concerned about what she had heard, Ms. Schneid contacted a neighbor, Jennifer Montgomery, to meet at the victim's house to make sure that the victim was not in any

difficulty. *Id.* at 61. A third neighbor, Kelly Sharkey, joined their endeavor. Ultimately, they came to observe the victim's body lying in a pool of blood on the floor of her house just inside the back door. *Id.* at 68–69. They called the police, who arrived shortly thereafter.[5]

Police Officer John Wharton of the Upper St. Clair Police Department testified that he responded to a call regarding an injured woman on June 4, 2003, between 2:00 and 3:00 p.m. *Id.* at 90. At the scene, he encountered three women who directed the police to the body and told them of the tan SUV that had been parked at the property just before their investigation. Officer Wharton ascertained that the victim was dead, noting that her shoulder appeared to have been dislocated, that there was a large quantity of blood around her head, and that the victim had three lacerations on her back. *Id.* at 94, 98. Officer Wharton checked the house in order to determine that the assailant was not still on the premises. The officer found no signs of forced entry. *Id.* at 94–97.

Detective Gary Tallent, a detective with the Allegheny County Police Department, testified that he was summoned to the victim's house on June 4, 2003, and had the responsibility for processing the crime scene. *Id.* at 103–05. Detective Tallent observed that the victim's body had been pulled by her shirt, which had been wrenched over her head. *Id.* at 134–35. Detective Tallent also discovered that a knife was missing from the butcher block on the kitchen counter and that the victim's purses had been disturbed and were devoid of cash, checkbooks, credit cards, and other identification. *Id.* at 121–22, 131.

Detective Tallent further testified that a piece of paper discovered on the kitchen counter by Officer Wharton had written upon it an address and telephone number that corresponded to the address and telephone number of Appellant's mother and stepfather. The address also corresponded to the address set forth on Appellant's driver's license. An investi-

5. Ms. Montgomery also testified and corroborated Ms. Schneid's testimony regarding the investigation of the victim's house and the discovery of the body.

gation soon revealed that Appellant had registered a tan 2000 Ford Explorer to that same address. *Id.* at 127–28. Finally, Detective Tallent testified that investigations revealed that the victim was having landscaping work done on her property around the time of her murder by a landscaping company for which Appellant had briefly worked. For these reasons, Appellant became a suspect. *Id.* at 128–29.

Joshua Arthur testified that he had worked with Appellant on a landscaping job at the victim's house on a day prior to the date of the murder. He observed that Appellant was shirking his landscaping duties by constantly engaging the victim in lengthy conversations. *Id.* at 144–45, 154. Andrea Kostella, the victim's daughter, testified that she lived with her mother when not working as a flight attendant, that her mother had checking accounts at Merrill Lynch and PNC Bank, and that her mother was not comfortable talking with strangers, but would open her door to a trusted or recognized person. *Id.* at 160–62.

Gretchen Hoge testified that on June 4, 2003, she was working as a bank teller at the Washington Federal Bank. She testified that on that day, in the afternoon, Appellant came into the branch and approached her to cash a check from the victim's PNC Bank account for $4,000. *Id.* at 166–67. She further testified that she told Appellant that he could either deposit the check into his account, where it would be subject to a three-day hold, or he could take it to a PNC Bank branch and try to cash it there. *Id.* at 167. She then testified that Appellant politely—and calmly—informed her that he would take the check to a PNC Bank branch. *Id.* at 168–69. This interaction was captured on the Washington Federal Bank's video camera, which documented the encounter as commencing at 2:59 on June 4, 2003. The still images from this video were introduced into evidence. *Id.* at 169–71.

Barbara Clemons testified that on June 5, 2003, she was working as a bank teller at the same branch of the Washington Federal Bank as the one where Appellant had attempted to cash a check drawn on the victim's account on the previous day. She testified that on June 5th, at approximately 1:27

p.m., Appellant came into the branch and approached her to partially deposit and partially cash a check from the victim's PNC Bank account in the amount of $2,500. *Id.* at 181–83, 189. Ms. Clemons explained to Appellant that the bank would not be able to cash the check because his checking account had been closed and there was not enough money in his savings account to cover what he wanted. Clemons explained that the best that the bank could offer would be for him to deposit the check, place it on hold until it cleared, and deduct from the check the back fees he owed on his checking account. *Id.* at 184. Appellant appeared to be satisfied with this process. The interaction was captured by the bank's video camera, and, again, still images from the video were introduced into evidence, as was the check that Appellant deposited. *Id.* at 185–90.

Tina Cline Puchi testified that she knew Appellant from working with him at an Applebee's restaurant in Washington, PA. *Id.* at 194–95. On June 4, 2003, she was living with her then-fiance, William Puchi, in an apartment, and when she returned home from work, she found that Appellant was watching a movie with Mr. Puchi. *Id.* at 195, 197. Appellant told the couple that he might be in some trouble, specifically the possibility that harassment charges might be made against him by a woman whom he had dated. Appellant had a scratch on his left neck. *Id.* at 199.

Appellant appeared again at the couple's apartment the next morning and asked Mr. Puchi to assist him with picking up his truck from a garage. *Id.* at 202–03. Ms. Puchi then went to work at the restaurant, where she was informed by her manager that the police were looking for Appellant. Ms. Puchi called the police and informed them that Appellant might be at her apartment. *Id.* at 204. Ms. Puchi then left the restaurant and met the police outside of her apartment, at which time she signed a consent form for them to search the premises. *Id.* at 205–06.

William Puchi testified in a manner that corroborated Ms. Puchi's account of Appellant's appearances at the apartment. *Id.* at 211–20. He further testified that when the police

arrived at the apartment on June 5th, Appellant ran into or toward the bathroom but was soon arrested. *Id.* at 220, 227.

Detective William Palmer of the Allegheny County Police Department testified that he was one of the detectives who arrested Appellant on June 5, 2003. At the time of his arrest, Appellant told Detective Palmer that the Puchis "had nothing to do with this" and that he was simply "hiding out" there. *Id.* at 235.

Detective Andrew Schurman of the Allegheny County Police Department also testified that he was one of the detectives who arrested Appellant on June 5, 2003. NT. Trial, 2/14/08, at 246–47. Detective Schurman testified that once Appellant was arrested and taken outside of the apartment, he said: "I committed murder" and "I killed that lady." *Id.* at 248. Detective Schurman further testified that when Appellant arrived at the police station following the arrest, Appellant was read his *Miranda* rights and provided with a Rights Warning Waiver form, which he signed. *Id.* at 249–53. Appellant declined to assert his rights and showed no signs of being under the influence of any substance during this time. *Id.* at 253–54.

Detective Schurman then testified that Appellant provided him and the other law enforcement personnel present with a statement. In this statement, Appellant indicated that he had met the victim while working on a landscaping job at her house and had returned to her house several days later, on June 4, 2003, "with the intention of robbing and killing her." *Id.* at 256. Appellant stated that he approached the victim with an offer to perform additional landscaping work, which the victim declined. When the victim turned to walk back into the house, Appellant stated that he grabbed her, threw her to the ground, kicked her, and stomped on her head and neck. He then pulled her by her leg and shirt into the kitchen, where he left her gurgling on the floor. Appellant stated that after leaving the victim in this condition, he went through the house in search of her money and checkbooks. After finding two checkbooks and a purse, Appellant then went back through the kitchen and proceeded to stab the victim with a

knife from the kitchen butcher block to make sure that she was dead. Appellant stated that he then wiped the knife off with a tissue, washed his hands in the sink, left through the back door, and then got into his car and drove away. *Id.* at 256–58.

Detective Schurman continued his testimony by describing Appellant's attempt, as related to him by Appellant, to cash one of the victim's checks and his burial of some of the evidence of the crime, including the knife and bloody clothing, in a wooded cemetery. *Id.* at 258. Detective Schurman then asked Appellant why he went to the victim's house. The detective testified that Appellant stated to him and the other law enforcement personnel present that he went to the victim's house, again, "with the intention of robbing and killing her" so that he could "get money to buy nice things." *Id.* at 259.

Detective Schurman then testified that Appellant agreed to take him and other officers to the site at a cemetery where he had buried the evidence of the murder. Detectives Schurman and Tallent and two uniformed officers accompanied Appellant to the cemetery, where nine items were extracted from the spots Appellant identified as the two burial sites. Among the items recovered were a knife, blood-splattered clothing, and blood-splattered Brahma work boots that plainly had the brand name "B–R–A–H–M–A" embossed on the sole of the boots. *Id.* at 259–70. Also recovered was a work glove that later proved to be the mate of a work glove found at the victim's house, a purse containing the victim's identification cards, and the victim's PNC Bank checkbook, minus at least one check. *Id.* at 267–70.

Detective Schurman additionally testified that back at the police station, Appellant asked him if Pennsylvania had the death penalty. When the detective answered in the affirmative, Appellant then asked if he could request execution. The detective testified that he replied that he would forward the request to the District Attorney's office. *Id.* at 274. Detective Schurman then testified that early the next day, Appellant agreed to provide a taped statement in addition to his earlier

oral statement. The transcript of this taped statement was then admitted into evidence, together with Appellant's signed verification as to the accuracy of the statement, and Appellant's taped statement was played for the jury. *Id.* at 275–78.

The Commonwealth then introduced extensive expert evidence that also connected Appellant to the crimes. Wayne Reutzel, a latent fingerprint expert with the Allegheny County Crime Lab, testified that Appellant's latent fingerprints were found on the checks of the victim that Appellant had attempted to cash following the crime. *Id.* at 306–08. Lisa Reutzel, Wayne Reutzel's wife, and a serological investigator and analyst with the Allegheny County Crime Lab, testified that the blood splatters found at the victim's house and on Appellant's clothes were consistent with the details of the crime as provided by Appellant in his statements to the police. *Id.* at 324, 326–31, 348–57. Thomas Meyers, manager of the serology and DNA section of the laboratory division of the Allegheny County Office of the Medical Examiner, testified that the blood from the bottom of Appellant's boot and from his cargo pants, which the police recovered from the cemetery, contained the victim's DNA. *Id.* at 373–77. Leon Rozin, M.D., chief forensic pathologist at the Allegheny County Office of the Medical Examiner, testified that he conducted an autopsy of the victim's body and concluded that the primary cause of death was manual strangulation, with blunt force trauma and stab wounds being contributory factors. *Id.* at 402, 405–06. Robert Levine, a forensic scientist in the Allegheny County Office of the Medical Examiner, testified that he examined the pair of Brahma boots that belonged to Appellant and compared them with autopsy photographs of the victim. *Id.* at 408–13. He further testified that, upon overlaying a scale transparency of the sole of Appellant's left boot on top of an autopsy photograph of the same scale, he discerned that the patterns of the sole of the boot corresponded in position and size to the pattern found on the skin of the victim, particularly the embossed "BRAHMA" label found on the sole of the boot. *Id.* at 412–15.

Appellant did not present any evidence disputing his killing the victim; in fact, Appellant essentially admitted to the jury in his opening statement that he had killed the victim. *See* NT. Trial, 2/12/08, at 46 ("I'm not here ... to dispute my involvement in this case ... [but to] ... dispute my state of mind during the time of the occurrence. I have to live with this dreadful and cumbersome burden for the rest of my life....."). As may be gleaned from this excerpt, Appellant attempted to prove, with both fact and expert witnesses, that he lacked the mental capacity to commit first-degree murder. His fact witnesses were a friend since childhood and co-workers who had witnessed the termination of his romantic relationship with a married co-worker. Appellant's expert witnesses were Carol Sue Johnston, Ph.D., a psychologist, and Stuart S. Burstein, M.D., a psychiatrist.

Dr. Johnston testified that following her 2003 evaluation of Appellant,[6] she could not form an opinion as to whether Appellant lacked the ability to conform his behavior to the law or understand the wrongfulness of his actions. Dr. Johnston opined that additional psychiatric examination would be required to evaluate these issues, and accordingly she recommended a psychiatric evaluation to consider whether Appellant had a serious "Axis I" mental illness. N.T. Trial, 2/19/08, at 16–17, 28. However, Dr. Johnston did not discern a disease of the mind or insanity. *Id.* at 17. She did not feel comfortable rendering a diagnosis without further evaluation by a psychiatrist. *Id.* at 21. Moreover, her ultimate report simply repeated those assertions made by Appellant to her regarding his childhood and behavior; Dr. Johnston did not judge whether these assertions were accurate. *Id.* at 22. These assertions included Appellant stating that: (1) when he was a school child, he picked on children weaker than he; (2) he later joined the military in order, among other things, to learn how to kill; (3) prior to the murder, he had persistent ideas of killing his former girlfriend; (4) immediately before the murder, he visited a nearby shopping mall to look at expensive

6. On cross-examination, Dr. Johnston characterized the actual time she spent with Appellant as a "brief interview." N.T. Trial, 2/19/08, at 20.

items; (5) he had only resumed alcohol consumption and marijuana use the day before the murder; and (6) when he attacked the victim, he fell into an attack mode that he had been taught in the military. *Id.* at 24–27. Dr. Johnston stated that she believed that by reporting an unusual number of symptoms, Appellant may have been "exaggerating." *Id.* at 27, 29–32.

Dr. Burstein testified that he had interviewed Appellant in 2003 for two hours and twenty minutes to determine issues of mental competency and potential criminal responsibility. *Id.* at 55. At that time, Dr. Burstein ordered Appellant to undergo a brain MRI and an EEG brain wave test. *Id.* at 56. He stated that the test results revealed no aberrations. *Id.* at 58. Nonetheless, Dr. Burstein opined that Appellant was psychologically diminished to the extent that he could not fully form an intent to kill. *Id.* at 78.

On cross-examination, however, Dr. Burstein admitted that Appellant had gone "out of his way" to get to the victim and had not simply come across her when in a depressive mood. *Id.* at 100. Furthermore, Dr. Burstein conceded that, not knowing Appellant's mind, he could not refute that Appellant had driven to the victim's house with the intent to kill her, as Appellant had admitted in his taped confession. *Id.* at 104. Dr. Burstein agreed that Appellant's actions on the day of the murder, including, in order, dragging the victim inside the house to hide her body, searching in specific locations in the house for money and checks, stabbing the victim to make sure she was dead, cleaning off the knife, burying evidence of the crime, and then proceeding to the bank to attempt to cash a forged check, all "strongly suggest" that Appellant knew what he was doing, knew that he had done something wrong, and had acted with a plan. *Id.* at 106–09. Although Dr. Burstein continued to assert his belief that Appellant's emotional confusion prevented him from having the specific intent to kill, Dr. Burstein also conceded "that by the end of [the] series of actions [on the date of the killing, Appellant's] desire was to see [the victim] dead." *Id.* at 110–11.

The Commonwealth presented its own expert witness, Bruce Wright, M.D., a psychiatrist, who testified that, in addition to interviewing Appellant for one and one-half to two hours, he had reviewed Appellant's post-arrest hospital records and Dr. Burstein's reports. *Id.* at 149–50. Dr. Wright diagnosed Appellant as suffering from either depression or schizophrenia, with a history of adjustment disorder resolved; a substance abuse problem; a personality disorder; mixed personality; and both antisocial and narcissistic traits. *Id.* at 182. Dr. Wright's primary diagnosis was that Appellant had maladaptive personality traits, namely antisocial and narcissistic traits, which resulted in self-centeredness and a sense of entitlement and grandiosity, triggering his daily motivations. *Id.* at 205. Despite these diagnoses, Dr. Wright was firm and unequivocal in his testimony that Appellant had the cognitive capacity to form the specific intent to kill and that he lacked any psychiatric condition that would impede him from thinking and acting in "a goal[-]directed manner." *Id.* at 160–61, 183, 186. In fact, Dr. Wright specifically noted as evidence of Appellant's cognitive capacity, the goal-directed manner by which he (1) planned to rob the victim; (2) made certain that the victim was dead or would die; (3) attempted to cash the victim's checks; and (4) hid the evidence of the crime. *Id.* at 160–61, 183–86. Finally, Dr. Wright testified that Appellant's behavior during psychiatric examinations with him and other health professionals indicated that Appellant was magnifying or inventing psychiatric symptoms, or, in the parlance used by Dr. Wright, "malingering." *Id.* at 163, 168–71, 182.

The foregoing evidence, viewed in the light most favorable to the Commonwealth as the verdict-winner, was amply sufficient to permit the jury to conclude, beyond a reasonable doubt, that Appellant unlawfully, intentionally, deliberately, and with premeditation and malice killed the victim. There is absolutely no question that the evidence was sufficient to find Appellant guilty of first-degree murder.

### Trial Court's Ruling on Appellant's Testimony

■ In Appellant's only guilt-phase issue, he argues that the trial court erred by "depriving" him of his right to testify

unless he did so in a manner whereby he either asked himself questions and then answered them, or had his standby counsel ask the questions. Stated differently, Appellant argues that the trial court erred by prohibiting him from delivering a narrative statement to the jury in lieu of testimony.

Appellant, representing himself during the guilt phase of his trial, informed the trial court that he wished to testify during his presentation of the case. The trial court ruled that his testimony must proceed in the normal manner, *i.e.*, that he would be posed a question and then would answer that question, and provided Appellant with two options: (1) Appellant could ask himself questions and then answer them; or (2) Appellant's standby counsel, Mr. Foreman, could ask questions of Appellant. After a lengthy discussion involving the trial judge, Appellant, Appellant's two standby counsel, and the prosecutor, Appellant determined that the alternatives offered by the trial court were inadequate. Appellant desired only to "testify" by delivering a narrative statement to the jury. Appellant never disclosed to the court the content of his proposed narrative. When the trial court ruled that Appellant would not be permitted to simply deliver a monologue to the jury, Appellant immediately told the court that he would not testify, claiming that it would be "illogical" to ask himself questions that he would then answer. The trial judge then engaged in a colloquy with Appellant to determine that Appellant was freely and voluntarily waiving his right to testify. Appellant assured the court that his decision not to testify was made freely and voluntarily without force, threat, or coercion. *Id.* at 129–38.

In post-sentence motions, Appellant argued that the court deprived him of his constitutional right to testify. At the hearing on those motions, Appellant testified that he declined the trial court's proposed methods of presenting his testimony for the following reasons. With respect to the reason Appellant decided against asking himself questions, Appellant testified that such a procedure would make him "look foolish" and "was just very distasteful." NT. Post–Sentence Motions Hearing, 6/30/09, at 14, 25. With respect to the reason Appel-

lant decided against having standby counsel ask him questions, Appellant testified, on cross-examination, that there was not enough time for counsel to formulate the questions. Appellant's relevant testimony, made in response to questions posed by the prosecutor on cross-examination, was as follows:

Q. So[,] when [the trial judge] gave you the opportunity to answer questions posed by Bob Foreman, your standby counsel, and then still let you cross-examine all [of the Commonwealth's] witnesses and still let you give your own closing argument[,] why didn't you take that opportunity?

A. Well, simply because of the fact that those questions should have been posed earlier to have a better preparation. You are giving me five, ten minutes to come up with questions to give to Bob Foreman in a hurried manner when I'm up here on a life and death situation[,] and I tried getting with Mr. Foreman earlier about what questions that, you know, I might want him to ask and the answers to give and, you know, those weren't—there was never time. What I mean with that is we never got together on that. I told· him that I wanted to have questions for him to ask me. It was never done. Subsequently, it was never done. You are going to give me five or ten minutes during the trial to come up with some questions. That is ridiculous.

Q. So[,] what you are telling me [is] that you and Mr. Foreman did talk about him asking you questions and you giving—

A. I had brought it up to him prior. It was like he shrugged it off. We waited until the last minute, you know, to come up with some type of format that you are going to give me in a hurried manner.

Q. What was the format that you came up with?

A. We never came up with a format. You gave me ten minutes to write the questions down.

Q. Do you remember me saying, quote, it would take 15 minutes to sit down and give Mr. Foreman the areas of inquiry? Do you remember that you said I agree with you totally?

A.   If that's what I said, sure.

Q.   Mr. Stollar, isn't it [a] point of fact that the reason that you decided not to testify in this case is because it was your opinion that it would be ridiculous?

A.   No. Well, that and on account of I thought I was forced to make a Hobson [sic] choice and painted [sic] in a corner of the room.

*Id.* at 23–25.[7]

The court's rejection of Appellant's post-sentence claim was grounded in several bases.  First, the court observed:

This [c]ourt never prevented [Appellant] from testifying[,] but only prevented him from testifying in the manner in which he decided was the most appropriate.  Having dealt with [Appellant] for the better part of five years prior to the commencement of trial, this [c]ourt was well aware of his inability to remain focused on the issue at hand.  This [c]ourt sought to insure that when [Appellant] testified, that he testified in a logical and understandable manner.  It never prevented [Appellant] from testifying but, rather, it prevented him from dictating the manner in which he was going to testify.

Trial Court Opinion at 32–33.

The court then noted that a trial court has the power to control the manner and conduct of a trial pursuant to Pennsylvania Rule of Evidence 611(a), which provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time[,] and (3) protect witnesses from harassment or undue embarrassment."  Pa.R.E. 611(a).

The court also noted the clear right for a criminal defendant to testify under the Fourteenth Amendment.  However, the court further observed that in *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987), this Court rejected a similar constitutional claim as that made here by Appellant.  In that

7.   Attorney Foreman did not testify at the post-sentence hearing.

case, the defendant, pursuing an insanity defense, was asked by his counsel, while the defendant very briefly sat on the witness stand, whether he desired to make a statement to the jury and, at another point, read to the jury a poem that he had written. The trial court sustained the Commonwealth's objections to these questions, preventing the defendant from either making a statement or reading the poem. The defendant ended his testimony when the court refused to allow either the statement to be made or the poem to be read to the jury.

■ On direct appeal, the defendant raised the claim that the trial court's rulings had deprived him of his constitutional right to testify on his own behalf. This Court rejected the defendant's arguments, beginning our analysis with the following observation: "We have never held ... that our constitution confers upon criminal defendants an unfettered right of self-expression in the courtroom during the guilt-determination phase of trial. Rather, the right to be heard is, as always, circumscribed by the rules of evidence." *Id.* at 78. We then observed that the record made it "obvious" that the defendant's argument was not related to a denial of his right to be heard, but pertained solely to the "limitations imposed by the trial court as to the content of his testimony." *Id.* Thus, we determined that, as the issue concerned the trial court's ruling on an evidentiary matter, the appropriate standard of review was to examine whether the trial court had abused its discretion. *Id.* at 78–79.

Relevantly, we concluded:

The issue ... is not the admissibility of the poem *as a writing;* the poem had already been admitted as a Commonwealth exhibit. Rather, the argument being advanced is that appellant's right to be heard encompassed the right to *read* the poem to the jury in open court, "with his own emphasis of meaning placed upon it" ... as a means of establishing that the poem was not, as the Commonwealth had attempted to establish, merely a contrivance designed to support an insanity defense. In other words, the recital of the poem was intended to establish that the delusions portrayed therein were genuine through the manner in

which the poem was read. While such a demonstration might have had a significant impact upon the jury, we are constrained to conclude that it was properly excluded as evidence.

In our adversary system of criminal justice, the defendant, like any other witness, is called to the stand to testify under oath by answering questions designed to elicit relevant facts. Appellant elected to take the witness stand, not to testify as to either the circumstances surrounding the crime or his mental condition during the commission of the crime, but to read a prepared statement, in verse form, directed at the jury. The obvious purpose of this statement was to dramatize appellant's purported delusions and display his demeanor, thus inducing a subjective response in the minds of the jurors as to his mental condition. Such a demonstration would have been subject to no evidentiary constraints and would have insulated the underlying testimonial assertion, *i.e.*, that appellant was legally insane at the time of the crime, from meaningful cross-examination.

*Id.* at 79 (emphases in original; citation to brief omitted).

In our case, the trial court determined:

The situation in [*Jermyn, supra,*] is no different than [Appellant's] situation. [Appellant], acting as his own counsel, wanted to dictate the manner in which he could conduct an examination of a witness and sought to present testimony in a narrative form[,] unlike any other witness. This [c]ourt was exercising its control over the manner in which the evidence would be presented to the jury[,] and one need look no further than his rambling, disjointed and, more often than not, illogical arguments to the jury contained in his opening statement and closing argument to understand the need to have [Appellant] testify like all of the other witnesses and not give him a soap box from which he could ramble aimlessly. Even his testimony at the time of his hearing on his post-sentence motions disclosed no basis for why he did not testify other than he was not permitted to dictate the manner in which he would testify.

[Appellant's] claim that he was denied his right to testify by the refusal of this [c]ourt to permit him to give an unrestricted monologue is nothing more than a bald allegation which fails to demonstrate that he was in any manner prejudiced by this [c]ourt's decision to direct that he respond to questions. [Appellant] has never articulated what testimony he would have presented had he been given the opportunity to testify in the manner which he so desired. Accordingly, without presenting evidence as to the nature of his testimony, he has failed to demonstrate how his decision not to testify would have resulted in a reasonable probability that the result of this trial would have been different.

Trial Court Opinion at 39–40.

Appellant now argues that the trial court's decision to preclude him from presenting a narrative statement to the jury in lieu of normal testimony was "unreasonable" and directly caused him to refrain from exercising his right to testify. Appellant's Brief at 16; *see also id.* at 18–19, 21–24. In support of this argument, Appellant first discounts the trial court's reliance on Pa.R.E. 611(a). Again, that Rule of Evidence provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time[,] and (3) protect witnesses from harassment or undue embarrassment." *Id.* Appellant contends that because he was the witness, part (3) had no applicability. Appellant also asserts that part (2) is irrelevant because "any disorganized rambling by [Appellant]" during testimony "would just as likely to occur in either ... format," including the "question-and-answer format suggested by [the trial] court." Appellant's Brief at 19. Whether the "disorganized rambling" occurred in a traditional format or during a narrative statement, Appellant posits, the Commonwealth could object to, and the trial court could limit, Appellant's discursive wanderings. *Id.*

Appellant contends that only part (1) has any applicability to the trial court's concerns, which he asserts were based in

part on the concern that Appellant would be untruthful in his narrative statement. Appellant blithely observes that he could be just as untruthful in a question-and-answer format as he could in a narrative format; *ergo*, the trial court's limitation to a question-and-answer format was not reasonably conceived. *Id.*

Appellant follows this rather astonishing argument with the related and also astonishing assertion that he would be unable to utilize a question-and-answer format that employed standby counsel because of the possibility of counsel's concern with suborning perjury: "Regarding potential perjury, Attorney Foreman (if he was to conduct the question and answer session on direct) was duty bound to let [Appellant] testify in narrative for [sic] rather than actively elicit false testimony.... [Appellant] was effectively—in light of ethical constraints placed on counsel—left to ask himself questions and answer them." *Id.* at 22–23. Notably, Appellant does not raise any argument that standby counsel would have had inadequate preparation time.

Appellant then asserts that the trial court's proposed process whereby he would ask himself questions and then answer them constituted an "insubstantial remedy." *Id.* at 22. Appellant argues in this regard:

This odd procedure would undermine the substance of [Appellant's] testimony and, actually, cause an unnecessary waste of time while [Appellant] tries [sic] to compose the questions to ask to bring in the testimony which he wished to submit. As has happened at times during [Appellant's] questioning of other witnesses, he would likely be asking the question in a declarative statement (that is, by narrative testimonial [sic] ) and the proceeding would be bogged down with Commonwealth objection or [c]ourt admonition to present a question which, in turn, would lead to [Appellant] losing his train of thought and further consuming time when he tried to regain his train of thought or covered the same matter again to make sure he did not leave something out. Accordingly, [Appellant] knew that his testimony would be greatly robbed of its force and vigor if he was limited to

presenting his own testimony in a question-and-answer format, so much so that he believed that not testifying was nearly as advantageous. Thus, it was because of the [c]ourt of [c]ommon [p]leas' stifling ruling that [Appellant] chose not to testify. That [c]ourt abused its discretion in precluding an acceptable form of presentation of testimony.

*Id.* at 23–24.

■ We agree with the trial court that Appellant's first issue is substantially similar to the one addressed in *Jermyn, supra.* As in *Jermyn,* the record here shows that Appellant was not denied his right to be heard; rather, his issue pertains solely to the "limitations imposed by the trial court as to the content of his testimony." *Id.,* 533 A.2d at 78. As such, the standard for reviewing this issue is whether the trial court clearly abused its discretion by imposing upon Appellant the "limitation" that his testimony be given in a manner comporting with the procedure of testifying of virtually every witness at every trial in this Commonwealth. *Id.* at 78–79. To reiterate what we said in *Jermyn:* there is no unfettered constitutional right of criminal defendants to self-expression in the court-room during the guilt-determining phase of trial. *Id.* at 78.

■ This Court has defined the standard for abuse of discretion as follows:

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 104 (1996) (quoting *Mielcuszny v. Rosol,* 317 Pa. 91, 176 A. 236, 237 (1934)).

Here, Appellant's arguments fail woefully to meet this standard. Appellant essentially posits that his proposed testimony would have been just as time-consuming, rambling, unfocused, subject to multiple Commonwealth objections—and dishonest—whether it would have been presented in question-and-

answer format or by way of a narrative speech. Therefore, according to this logic, the trial court's determination that the question-and-answer format would have been more time-effective and conducive to ascertaining truthful and relevant testimony than Appellant's proposed narrative statement was not reasonable. Quite simply, this ridiculous argument does not support a claim that the trial court acted with manifest unreasonableness by requiring Appellant to present his testimony in the format followed by virtually every live witness in a criminal proceeding.

Appellant's additional argument that his testimony would have been "undermine[d]" and "robbed of its force and vigor" if not delivered as a narrative statement is equally baseless. Appellant's Brief at 23–24. Appellant has never given any evidence or even any indication as to what his proposed testimony would have been or what subjects it might possibly have covered. Indeed, as the trial court observed, Appellant provided no serious reason during his post-sentence hearing testimony concerning why he could not have presented his testimony in a question-and-answer format. Trial Court Opinion at 39. Therefore, no foundation has ever been laid to support Appellant's hollow assertions, assuming, to give Appellant every benefit of the doubt, that there could ever be a circumstance that testimony by the question-and-answer format would be inadequate.

With nothing but bald assertions, Appellant seems to argue that only a theatrical performance would have been sufficient to attain his goals, whatever they may have been. As we determined in *Jermyn*, a theatrical approach to giving testimony, where the only issue appears to be one concerning a diminished capacity or insanity defense, is wholly inappropriate. *Id.* at 79. Moreover, as we have observed: "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759, 778 n. 25 (2009) (quoting *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

Finally, Appellant's assertion that he would not have been able to timely and effectively compose questions to himself is also unavailing. When Appellant asserted his right to represent himself and assumed the role of counsel, he assumed the responsibilities commensurate with his choice. *Pro se* defendants are held to the same standards as licensed attorneys. *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 535 (2006). Therefore, it was incumbent upon Appellant to have prepared himself for trial as would any attorney. Moreover, Appellant never requested from the trial court additional time or a brief continuance to compose his questions.

Furthermore, Appellant never testified at his post-sentence hearing that he had waived his right to testify because he lacked the time to prepare questions for himself. Rather, he testified that he did not want to ask himself questions because he feared that such a process would make him "look foolish," and opined that the procedure would have been "just very distasteful." NT. Post–Sentence Motions Hearing, at 14, 25. Additionally, because Appellant never indicated at any point what his putative testimony would have consisted of, any claims that he would not have been able to formulate his questions is at best speculative.[8] Accordingly, Appellant's argument has no support in the record.

We do not discount the possibility that in some circumstances, a defendant representing him—or herself will encounter challenges when presenting his or her own testimony. However, based on the record before us, Appellant's claims that either (1) he was denied the right to testify; or (2) the trial court abused its discretion by its posing to Appellant the aforementioned two possible paths to present his testimony, are wholly without merit.

8. Again, Appellant did not dispute that he killed the victim. Rather, his defense was based on insanity or diminished capacity. Therefore, he could simply have inquired of himself as to his state of mind at the time of the incident or at other relevant times. Regarding Appellant's concerns about the "foolishness" of the procedure, he could have easily asked the trial court to explain to the jury that the circumstance of his self-representation required that he first pose a question to himself and then answer it.

## Victim Impact Testimony and Emotional Disturbance Mitigating Factor

■ Appellant next raises two ineffectiveness of counsel claims arising from alleged deficiencies in counsels' advocacy during the penalty phase of Appellant's trial. The trial court had disposed of these two claims following an evidentiary hearing.

For more than ten years, this Court has applied the rule that claims of ineffectiveness of counsel must be raised on collateral review, not on direct appeal. *See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002). However, an exception arose under our case law premised upon the supposition that when the relevant ineffectiveness claims have been properly raised and preserved in the trial court, the trial court holds a hearing on those claims, and the trial court addresses the merits of the claims in a subsequent opinion, these ineffectiveness claims may be reviewed on direct appeal pursuant to the so-called *"Bomar* exception." *See Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1018 (2007); *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 853–55 (2003).

Significant criticisms of the extent of the use of the *"Bomar* exception" raised questions concerning the appropriateness of its continued viability. Those questions have now been definitively answered in our recently filed case, *Commonwealth v. Holmes,* 621 Pa. 595, 79 A.3d 562 (2013). Specifically, we relevantly held in that case:

> *Grant*'s general rule of deferral to PCRA [9] review remains the pertinent law on the appropriate timing for review of claims of ineffective assistance of counsel; we disapprove of expansions of the exception to that rule recognized in *Bomar;* and we limit *Bomar,* a case litigated in the trial court before *Grant* was decided and at a time when new counsel entering a case upon post-verdict motions was required to raise ineffectiveness claims at the first opportunity, to its pre-*Grant* facts. We recognize two exceptions, however, both falling within the discretion of the trial judge. First,

9. Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–46.

we appreciate that there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and we hold that trial courts retain their discretion to entertain such claims. [ ]

Second ... where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record-based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown, and (2) the unitary review so indulged is preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA.

*Id.* at 563–64.

In the instant case, the trial court reviewed Appellant's ineffectiveness claims pursuant to the *Bomar* exception, a process now disapproved by this Court in *Holmes*. Such claims must now be deferred to PCRA review, whereupon there will be an opportunity for greater development than that which occurred in the post-trial proceeding before the trial court here. Accordingly, and pursuant to *Holmes, supra,* we dismiss Appellant's two ineffective assistance of counsel claims raised herein, without prejudice should Appellant decide to include and potentially further develop these two claims in a timely filed petition pursued under the PCRA.

### Review of Death Sentence

■■■ Having concluded that Appellant is not entitled to any relief on the reviewable claims that he raises and that the guilt phase evidence is sufficient, we are now required by statute to review the imposition of the sentence of death. 42 Pa.C.S. § 9711(h)(1). We must affirm the sentence of death unless we determine:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in [42 Pa.C.S. § 9711(d) ].

42 Pa.C.S. § 9711(h)(3).

The record discloses no indicia of arbitrariness and does not suggest that the sentence of death was the product of passion or prejudice. Rather, the sentence was based upon sufficient evidence that Appellant intentionally killed Jean Heck. Additionally, the sentence is in compliance with the statutory mandate for the imposition of a sentence of death where one or more aggravating circumstances are found to outweigh any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). The record shows that the jury balanced the one aggravating circumstance against the two mitigating circumstances and determined that the aggravating circumstance outweighed the mitigating circumstances. Therefore, there is no ground to vacate the sentence pursuant to 42 Pa.C.S. § 9711(h)(3)(i).

More specifically, our review of the record supports the jury's finding of the aggravating circumstance that Appellant committed the murder during the perpetration of a felony, specifically robbery or burglary. *See* 42 Pa.C.S. § 9711(d)(6). Appellant assaulted the victim and dragged her into her home to steal money and the victim's checkbooks. Appellant then forged the victim's checks and attempted to cash them at his bank immediately after the killing and on the next day. Appellant brutally beat, stomped upon, and stabbed the elderly victim to make sure of her death. Accordingly, we affirm the verdict and the sentence of death.

Appellant's judgment of sentence is affirmed.[10]

Former Justice ORIE MELVIN did not participate in the consideration or decision of this case.

10. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE, Justices EAKIN, BAER and TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion in full, writing solely to supplement the Court's discussion of our recent decision in *Commonwealth v. Holmes*, 79 A.3d 562 (Pa.2013).[1]

As relevant here, *Holmes:* (1) reaffirmed the general rule established in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), that claims of ineffective assistance of counsel are to be deferred to collateral review under the PCRA[2]; (2) disapproved of expansion of the so-called *"Bomar* exception"[3] to *Grant:* (3) "limit[ed] *Bomar*, a case litigated in the trial court before *Grant* was decided and at a time when new counsel entering a case upon post-verdict motions was required to raise ineffectiveness claims at the first opportunity, to its pre-*Grant* facts"; and (4) recognized two exceptions to the *Grant* deferral rule, both falling within the discretion of the trial court. First, trial courts retain discretion, in extraordinary circumstances, to entertain a discrete claim (or claims) of trial counsel ineffectiveness if the claim is both apparent from the record and meritorious, such that immediate consideration best serves the interests of justice. Second, trial courts also have discretion to entertain prolix claims of ineffectiveness (such as those entertained in *Bomar* ), but only if there is good cause shown and the unitary review thus permitted is accompanied by a knowing and express waiver by the defendant of the right to pursue a first PCRA petition. 79 A.3d at 563–64. *Holmes* explained, at length, the reasons for each of these points of law, and stressed the particular importance of the exceptions in capturing collateral claims in short-sentence cases.

1. This case was held internally pending *Holmes.*
2. Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.
3. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853–55 (2003).

Here, the Majority correctly defers appellant's two ineffectiveness claims to the collateral stage. The trial court made clear that it entertained appellant's ineffectiveness claims strictly pursuant to *Bomar*:

> In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), the Pennsylvania Supreme Court directed that all claims of the ineffectiveness of counsel should be raised in a collateral postconviction relief proceeding. This directive recognized that a defendant had the option under Pa.R.Crim.P. 720, to either file post-sentencing motions and then file a direct appeal to an Appellate Court if those motions were denied, or file a direct appeal to the Appellate Court. In filing a direct appeal alleging the ineffectiveness of counsel, a reviewing Court is deprived of a record on those alleged issues, accordingly, the Supreme Court declined to review those issues until such time as a record was developed. In *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), an exception to this rule was recognized. If a defendant has filed post-sentencing motions raising the questions of the ineffectiveness of his counsel that would permit the Trial Court to hold a hearing on those issues and generate a record which would permit meaningful appellate review.

Tr. Ct. Op. at 43 n. 8. Put another way, the trial court addressed the merits of appellant's ineffectiveness claims, but not on the basis of what *Holmes* now recognizes as valid exceptions to the rule of deferral expressed in *Grant*. To wit, the court did not find appellant's ineffectiveness claims to be so meritorious and apparent from the record as to require immediate vindication (to the contrary, the court rejected all of appellant's ineffectiveness claims as essentially meritless); nor did the court reach the merits of these claims because appellant validly waived his right to PCRA review. Although the trial court proceeded under *Bomar*, *Holmes*'s express disapproval of extensions of *Bomar*, and its limiting of *Bomar* to that case's pre-*Grant* facts, requires that these claims be deferred to PCRA review, where appellant will be free to better develop them.

Notably, even if *Holmes* had not expressly limited *Bomar*, deferral would still be the proper course here. New counsel raised a number of ineffectiveness claims post-verdict, but all such claims appear to have derived solely from the trial record, without supplementation by an external post-trial investigation. Thus, this case is not like *Bomar*, where new counsel marshaled a full and complete collateral attack. Furthermore, on appeal, appellant pursues but two of the claims he raised below, both of which are based upon the existing record, supplemented only by trial counsel's testimony at the hearing on appellant's post-verdict motions. It appears that the second claim is waived in whole or in part: the claim has morphed from alleging a failure to request a penalty phase jury charge on emotional disturbance mitigation (as argued below) into a broader challenge (now argued on appeal) alleging a failure to make use of guilt phase testimony to pursue mental health mitigation during the penalty phase. Given the importance of mitigation-based claims of ineffectiveness, and the fact that it is apparent that appellant suffers from some mental impairment or instability, it is better to afford him a full chance to develop this collateral claim—and any others he may have—under the PCRA.

Justice SAYLOR, concurring.

I join the majority opinion in terms of its sufficiency analysis and its determination that the ineffectiveness claims are properly deferred to collateral review pursuant to *Commonwealth v. Holmes,* 621 Pa. 595, 79 A.3d 562 (2013). I also support the outcome regarding Appellant's claims concerning his right to testify, as well as our statutory review, albeit my reasoning differs.

First, I do not read Appellant's arguments regarding his right to testify as positing that "only a theatrical performance would have been sufficient to attain his goals[.]" Majority Opinion, at 133, 84 A.3d at 650. Rather, his contention seems to be that the remedy imposed by the trial court would not have alleviated that tribunal's concerns, thereby failing to comport with the United States Supreme Court's admonition

that states "must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987), *quoted in* Brief for Appellant at 21. Nevertheless, I agree that the trial court ultimately acted within its discretion in placing reasonable boundaries upon the form of Appellant's testimony, as it is required to do by evidentiary rule 611(a).

As for statutory review, *see generally* 42 Pa.C.S. § 9711(h)(3)(i) (precluding affirmance of a death sentence that is the product of, *inter alia*, passion or prejudice), the present penalty-phase record gives me pause. It reflects testimony by a total of eight victim-impact witnesses, at least two of whom were minors (including a ten-year-old), comprising the entire penalty-phase presentation by the Commonwealth and more than half of all the penalty-phase testimony. While such evidence is legally permissible, it is nonetheless possible for an excessive accumulation of this type of testimony to introduce undue passion into the jurors' penalty-phase deliberations.

In this regard, it is worth noting that the New Jersey Supreme Court has established procedural safeguards to ensure that victim-impact testimony comports with due process, and these safeguards include a proviso that only a single victim-impact witness is generally sufficient to serve the purpose of such testimony, and additionally, that the testimony of minors should be avoided. *See State v. Muhammad*, 145 N.J. 23, 678 A.2d 164, 180 (1996). This Court summarized such provisions without endorsing them, *see Commonwealth v. Means*, 565 Pa. 309, 329 n. 7, 773 A.2d 143, 155 n. 7 (2001), albeit it did note that many other states have adopted similar safeguards. *See id.* at 331, 773 A.2d at 156. Accordingly, we are dependent on the sound administration of trial court discretion in maintaining appropriate and rational limitations.

In the present case, I believe the trial court, at the very least, has tested the boundaries. The sheer number of witnesses was potentially problematic and, at a minimum, should have alerted all involved in the trial to take extra precautions to ensure that the testimony remained within acceptable

bounds. That did not happen. One witness, for example, described the horrors that would have ensued if, hypothetically, his four-year-old child had been present at the victim's residence when the incident occurred. *See* NT., Feb. 21, 2008, at 370–71.[1] Another gave the jury a recitation of the crime itself. *See id.* at 382–83.[2] Still another opined about the appropriate punishment for Appellant. *See id.* at 397 ("[S]how Mr. Stollar that [the victim] had a right to live ... let Mr. Stollar reap the punishment that fits the crime...."). None of these topics are appropriate to victim-impact testimony, which "is defined as 'evidence concerning the victim and the impact that the death of the victim has had on the family of the victim.' " *Commonwealth v. Rega*, 593 Pa. 659, 701, 933 A.2d 997, 1022 (2007) (quoting 42 Pa.C.S. § 9711(a)(2)).

With that said, Appellant's challenge to the victim impact testimony is subsumed within his claim of deficient stewardship on the part of his penalty counsel, and, thus, I believe the appropriate prejudice assessment, if necessary, should be made at the postconviction stage. *See generally Commonwealth v. May*, 612 Pa. 505, 518, 31 A.3d 668, 676 (2011) (where counsel did not interpose a contemporaneous objection, indicating that allegedly problematic aspects of the penalty phase should be deferred to collateral review and handled within the framework of ineffective-assistance-of-counsel claims). I would, however, stress to the bench and bar that close adherence to defined parameters should be carefully

1. "I've sat there this whole time and been horrified by the fact that [my son] could have been there. He would have been there. What would have happened to him if he would have been present in that house? Would he have been a victim, murdered like Jean, or possibly worse than that, been left at four-and-a-half-years-old to wander around the house until somebody came to help him and rescue him to look at his grandmother. Can a child that age ever recover from something like that? I don't know. I'm trying to figure out as a family how we recover from that."

2. "My ... grandmother ... had her face smashed in the ground, repeatedly stomped on and pour her love and generosity all over her back porch in a pool of her own blood. She was stabbed to death. She was taken advantage of to the highest extreme and pulled back into her kitchen floor in her blood. She was dragged through her own blood making it look to all as if her love and care was never of any value ..."

observed consistent with this Court's superintendency obligations in Pennsylvania's death penalty regime.

Finally, and as an aside, with regard to the ineffectiveness claims I appreciate that the common pleas courts have had a difficult task in the assessment of the appropriate forum in which to address claims of deficient attorney stewardship, particularly during periods when this Court's jurisprudence has been the subject of debate and transition. *Cf. Commonwealth v. McGill*, 574 Pa. 574, 586, 832 A.2d 1014, 1022 (2003) (acknowledging that the manner in which PCRA petitioners must plead and prove claims of ineffective assistance "has been a source of disagreement and confusion"). With the decision in *Commonwealth v. Holmes*, 621 Pa. 595, 79 A.3d 562 (2013), it is my hope that we may now emerge from one such transition period.[3]

**3.** Although a post-sentence hearing was held, I do not believe that permitting Appellant to raise the same ineffectiveness claims in a PCRA petition will improperly "afford [him] the right to two collateral attacks." *Holmes*, 621 Pa. at 617, 79 A.3d at 575 (quoting *Commonwealth v. Wright*, 599 Pa. 270, 320 n. 22, 961 A.2d 119, 148 n. 22 (2008)). The hearing produced only minimal testimony from Appellant's penalty-phase counsel, and the common pleas court summarily dismissed the post-sentence motions and treated the ineffectiveness claims generally in a cursory manner in its subsequent opinion. An orderly post-conviction proceeding should produce more appropriate judicial treatment.