J-S38027-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                         :             PENNSYLVANIA
                                           :
               v.                            :
                                           :
                                           :
MICHAEL J. DIMAURO                  :
                                           :
              Appellant              :     No. 2856 EDA 2023

Appeal from the Judgment of Sentence Entered August 17, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002948-2021

BEFORE:    STABILE, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.:                  **FILED DECEMBER 6, 2024**

Michael J. DiMauro ("DiMauro") appeals from the judgment of sentence entered by the Philadelphia County Court of Common Pleas ("trial court") after jury convicted him of first-degree murder, conspiracy to commit first-degree murder, firearms not to be carried without a license, hindering apprehension or prosecution, carrying a firearm on public streets in Philadelphia, possessing instruments of crime, obstructing the administration of law, abuse of corpse, and tampering with or fabricating physical evidence.[1] On appeal, DiMauro challenges the weight of the evidence underlying the jury's verdict. We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 903, 6106(a)(1), 5105(a)(1), 6108, 907(a), 5101, 5510, 4910(1).

This case arises out of a series of murders involving the "Warlocks Motorcycle Club." The trial court detailed the testimony presented by the parties at DiMauro's trial for the murder of David Rossillo, Jr. ("Rossillo"):

> Philadelphia Police Detective Joseph Bamberski testified that in February 2020, Buck Evans [("Evans")] spoke with him and his partner regarding the whereabouts of Keith Palumbo [("Palumbo")], who had been reported missing to the Upper Darby Police Department. Evans informed Detective Bamberski that Palumbo had been murdered and his body had been "dumped" in the Mount Moriah Cemetery in Lower Merion, Philadelphia. The Philadelphia Police Department subsequently initiated an investigation into [Palumbo]'s murder. Philadelphia Police Officer John Taggart, who was assigned to the Crime Scene Unit, testified that he searched a house on Woodland Avenue on April 2, 2020, which was believed to be where Palumbo's murder occurred. After blood evidence was found at the residence, the investigation moved to Mount Moriah Cemetery.
>
> On April 3, 2020, Officer Taggart, Detective Bamberski, and several other officers from Philadelphia and Delaware County searched the cemetery[.] One of the officers present noticed scrape marks alongside a crypt covered by an off-center capstone. Detective Bamberski testified that the capstone's misalignment created a small opening into the crypt, which, along with the scrape marks, indicated that the capstone had been moved recently. The investigative team used a small, flexible camera to squeeze through this opening to see the contents of the crypt and captured images of a large blue tarp. Both Officer Taggart and Detective Bamberski observed that such a tarp seemed out of place for a crypt whose last occupant, according to the monument, should have been buried in the 1800s.
>
> Subsequently, the investigative team obtained a warrant to search the contents of the crypt. Inside, they found two (2) bodies lying on tracks built at the base of the crypt: the body of [Palumbo], wrapped in a rug from the Woodland Avenue residence, and a second body, wrapped in a blue tarp with a rope tied around the neck. Detective Bamberski testified that the second body was in "an advanced state of decomposition" which prevented the investigative team from determining the identity, race, or sex of the deceased individual. Detective Bamberski

- 2 -

testified, however, that he suspected the second body belonged to [Rossillo] because [he] was a missing person from Delaware County and [Evans] had informed him of rumors circulating throughout the Warlocks community that [Rossillo] had been placed "in a hole out in a cemetery."

*     *     *

Following the discovery of the bodies in the crypt, the investigative team contacted the Medical Examiner's office to assist with moving the bodies. After the bodies were moved, the investigative team discovered a black knife which was wrapped in black electrical tape and contained carpet material that linked back to the Woodland Avenue residence. Officer Taggart testified that Donna Morelli [("Morelli')], who owned a house on Trinity Street[,] which abutted Mount Moriah Cemetery, supplied the investigative team with several key pieces of information regarding [the] murder[s]. …

Detective Bamberski testified that he interviewed [Morelli] on April 7, 2020. During this interview, Morelli identified [DeLuca] as [Palumbo]'s killer and [DiMauro] as [Rossillo]'s killer. Morelli conveyed a negative disposition toward DeLuca during the interview and told Detective Bamberski that DeLuca was "not well thought of" or "well liked," explaining that DeLuca had assumed control of the Warlocks Motorcycle Club and made decisions that other members of the club were not "happy with." Detective Bamberski testified that Morelli was more reluctant to name [DiMauro] as [Rossillo]'s killer due to their long-standing relationship as friends and association through the Warlocks Club.

After Morelli identified [DiMauro] as [Rossillo]'s killer, she gave Detective Bamberski her account of the events leading up to and following the murder, which she also testified to at [DiMauro]'s trial. In December 2017, both [DiMauro] and [Rossillo] came to Morelli's house on Trinity Street and walked with Morelli into Mount Moriah Cemetery. At some later point, Morelli left after [DiMauro] directed her to retrieve ice cream. When she returned, Morelli called out to her boyfriend at the time, Domenic Soster [("Soster")], who was in a barn in the backyard of the property, and asked him if he had seen [DiMauro]. After Soster stepped out, Morelli heard four (4) gunshots from two (2) different caliber firearms — a lighter caliber and a "bigger" caliber. Morelli then told Soster to come into her house on Trinity Street.

- 3 -

Several hours later, [DiMauro] came inside the house looking disheveled and requested help with opening a crypt. Morelli and Soster, both of whom had been doing drugs that night, joined [DiMauro] outside to help him open the crypt. Morelli testified that while she was outside helping [DiMauro] open the crypt, she did not see [Rossillo]. When she asked [DiMauro] where [Rossillo] was, [DiMauro] indicated that [Rossillo] was in a separate location in the cemetery.

Soster, who was interviewed by police on April 23, 2020, also testified regarding his whereabouts and activities the night of [Rossillo]'s murder. Soster admitted to struggling with a heroin addiction for ten (10) years which led to him losing his membership in the Warlocks club[,] but noted that he had been sober for two (2) years at the time of his testimony. Soster testified he was [Morelli]'s boyfriend at the time of [Rossillo]'s murder and that he was living with Morelli at the Trinity Street residence. Soster testified that he was in a tool barn in the back of the Trinity Street property when he heard gunshots. Soster then went inside the residence after Morelli, who had also heard the gunshots, called out to him. A short time later, Soster returned to the barn with Morelli to retrieve tools they could use to help [DiMauro] pry open the lid to a crypt. While Soster, Morelli, and [DiMauro] worked to open the crypt, Soster overheard a conversation between Morelli and [DiMauro] regarding [Rossillo]'s whereabouts. After the crypt was opened, Soster and Morelli walked back from the cemetery back to the Trinity Street residence, at which point Morelli informed Soster that [DiMauro] had shot [Rossillo].

In her April 7th interview, Morelli told Detective Bamberski that [DiMauro dragged Rossillo]'s body using a rope tied around his neck, and threw the body into the grave that Soster, Morelli, and [DiMauro] had just opened. Morelli testified that she was not present when [DiMauro] dragged the body or disposed of it in the crypt and that [DiMauro] had told her these details within a couple weeks of the incident. Specifically, [DiMauro] told Morelli that he had shot [Rossillo] twice with a .22 caliber firearm. [DiMauro] then pulled out his "carry piece," a .40 caliber firearm which Morelli testified [DiMauro] ordinarily carried, and shot [Rossillo] additional times. According to [DiMauro, Rossillo] did not die until [DiMauro] broke his neck with the rope.

When asked about [DiMauro]'s potential motive for this murder, Morelli testified that [DiMauro] had confronted [Rossillo] about his alleged sexual harassment of Morelli's stepdaughter. Morelli indicated to Detective Bamberski in her interview that she, too, was not happy with [Rossillo]'s relationship with her stepdaughter. Morelli testified consistently with this, stating that she did not "particularly care for" [Rossillo]. Morelli testified that [DiMauro] had, at times, threatened violent conduct in the past but that she did not think [DiMauro] was capable of such conduct. Morelli testified that she had previously been reluctant to implicate [DiMauro] in [Rossillo]'s murder because [DiMauro] knew Morelli's family and had been to Morelli's family home. Additionally, Morelli expressed her initial reticence to implicate [DiMauro] because going to the police would potentially mark her and her family as targets.

Despite these fears, Morelli testified that she divulged the information she had regarding the murders of [Palumbo] and [Rossillo] after the bodies were discovered on April 3, 2020. Morelli admitted that she was present when the crypt was opened a second time for the disposal of Palumbo's body. As a result, Morelli was charged with and ultimately pled guilty to several criminal offenses, including hindering apprehension or prosecution and obstruction of justice. For these offenses, Morelli received a jail sentence which she was serving at the time of her testimony at [DiMauro]'s trial. Additionally, Morelli faced two (2) open charges of intimidation of witnesses after video statements taken from Evans and Gibson, who had both cooperated with the investigation of [Palumbo]'s murder, were posted on Facebook.

Morelli also admitted that she had attempted to supply [DiMauro] with a note warning him of the discovery of [Rossillo Jr.]'s body and urging [DiMauro] to run. Morelli left this note at McDowell's auto shop two (2) or three (3) days after [] she was interviewed by Detective Bamberski on April 7, 2020. She hoped that the owner of the shop, who Morelli knew was good friends with [DiMauro], would relay the message to [DiMauro]. …

When questioned about why she attempted to warn [DiMauro] with the note days after the discovery of the bodies in the cemetery became public, Morelli explained that she … found out about the discovery of the bodies only a day or two before her residence was raided. Morelli stated that she made no attempts to contact anyone pertaining to the investigation nor leave her

home in the days immediately following the raid due to the presence of the police and the perceived surveillance of her home. Morelli testified that she chose to leave the note at McDowell's auto shop instead of somewhere closer to her residence, like the residences of [DiMauro]'s parents and [DiMauro]'s girlfriend, because "the cops [were] following [her]" and she was traveling from Lancaster at the time and not from her residence. Morelli further explained that [DiMauro] had told her that McDowell was his friend who, on various occasions, had given money to [DiMauro].

* * *

On April 4, 2020, Dr. Lindsay Simon, an expert in the field of forensic pathology, performed an autopsy on [Rossillo]'s body. Dr. Simon testified that [Rossillo]'s body was in an "advanced state of decomposition" and "mostly skeletonized," with very little soft tissue remaining externally. Dr. Simon noted during her examination that the clothing that [Rossillo] was wearing had begun to break down from exposure to decomposition and that a darkly colored rope was tied around his neck. Dr. Simon testified that she recovered four (4) pieces of ballistic evidence from [Rossillo]'s torso — two (2) gray metal bullets, one (1) metallic bullet jacket, and an additional fragment of metal which Dr. Simon believed to be a bullet core.

Dr. Simon further testified that she observed fractures to [Rossillo]'s hyoid bone, right rib, left shoulder blade, and face from the eye down. Dr. Simon noted blood staining on the bones at the fracture sites of [Rossillo]'s jaw, shoulder blade, and rib, which indicated to her that [Rossillo] was still alive when he received these wounds. Dr. Simon stated that the remaining fractures to [Rossillo]'s face were so significant that they prevented reasonable examination for staining to determine if they also occurred prior to death. Finally, Dr. Simon concluded to a reasonable degree of scientific certainty that [Rossillo]'s cause of death was violence that included multiple gunshot wounds and that the manner of his death was homicide.

* * *

[I]n the weeks leading up to [DiMauro]'s trial, … two (2) individuals, Gregory Alexander [("Alexander")] and Darrin Rogers [("Rogers")], contacted the Philadelphia District Attorney's office

with information regarding [DiMauro]'s case. Alexander wrote a letter to the District Attorney's office which stated: "I know about the two bodies that was found in Southwest Philly cemetery. I also know about the girl that live next door to the cemetery that is on bail. I am [DiMauro]'s cellmate[.] We need to talk ASAP."

Detectives from the Homicide Unit contacted Alexander and brought him in for a videotaped interview on July 13, 2023. Alexander subsequently testified at [DiMauro]'s trial regarding the letter he sent to the District Attorney's office and his knowledge of [DiMauro]'s case. Alexander testified that while he and [DiMauro] were cellmates at Curran-Fromhold Correctional Facility ("CFCF"), [DiMauro] had told Alexander that [DiMauro] and a woman who lived "next to a graveyard ... in Southwest Philly" had killed a man. Alexander stated that [DiMauro] had admitted to smoking crystal meth with this woman and that he regretted doing so, as he would not have been incarcerated had he not taken "the last puff" of the meth. Alexander admitted that he had three (3) open cases — two (2) robbery cases and one ( 1) VUFA case — at the time of [DiMauro]'s trial, but that he offered his testimony without acquiring any promises from the District Attorney's office regarding these open matters.

On July 28, 2023, [Rogers], a former member of the Warlocks Club, met with detectives to offer information regarding the case. At the time, Rogers had one (1) open case in Delaware County for trespass and receiving stolen property. …

[At DiMauro's trial, Rogers] testified that [Rossillo] had been staying with him at his home at 883 Fairfax in Drexel Hill around the time that [Rossillo] was arrested in December 2017. Rogers recalled that this was the last time he saw [Rossillo] alive or heard from him. Rogers testified that sometime before he was arrested himself in 2018, members of Rossillo's family had approached him and informed him about rumors that [Rossillo] was missing. In response to questions from Rossillo's family of whether he knew anything about [Rossillo]'s whereabouts, Rogers stated that he believed [Rossillo] was still in jail from his December 2017 arrest.

Rogers explained that he only came forward with this information after nearly three (3) years because he became aware of rumors that there was a second shooter in [Rossillo]'s murder. Rogers expressed concern that he could be inculpated as this second shooter, as he had seen a Facebook video of witnesses

testifying about the murder investigation of [Palumbo,] which named Rogers as a potential suspect in [Rossillo]'s murder. Consequently, Rogers sought to clear his name by offering his testimony at [DiMauro]'s trial, where he emphasized that he did not participate in the murder of [Rossillo].

In his defense, [DiMauro] called George Chandler [("Chandler")] and Brian Foster [("Foster")], who both testified that [Alexander] had a bad reputation for truthfulness. Both Chandler and Foster admitted that they each had an open murder charge for which they were in custody. Chandler also admitted to having a prior conviction for aggravated assault. Chandler testified that he had known Alexander for sixteen (16) months and had been Alexander's cellmate for thirty (30) days, while Foster testified that he had "made [the] acquaintance" of Alexander in October 2022 while at CFCF and knew "close to about a hundred" other individuals who knew Alexander.

Trial Court Opinion, 2/12/2024, at 3-12 (record citations omitted).

DiMauro was charged with the aforementioned crimes. Prior to trial, DiMauro requested to represent himself and on February 9, 2022, the trial court held a **Grazier**[2] hearing. Following the hearing, the trial court ruled that DiMauro could proceed pro se and appointed standby counsel.

On August 1, 2023, DiMauro's jury trial commenced. On August 4, 2023, the jury found DiMauro guilty of all charges. On August 17, 2023, DiMauro's standby counsel entered his appearance as counsel. The same day, the trial court sentenced DiMauro to life imprisonment without the possibility of parole for first-degree murder, and imposed concurrent sentences of twenty to forty years for conspiracy to commit murder, three-and-a-half to seven

---

[2] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

years for firearms not to be carried without a license, and one to two years for carrying a firearm on public streets in Philadelphia. DiMauro filed a timely post-sentence motion in which he challenged the weight of the evidence underlying his convictions, which the trial court denied on September 27, 2023.

On October 25, 2023, DiMauro timely appealed to this Court. Both DiMauro and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925. DiMauro now presents the following issue for review: "Is the verdict of guilty against the weight of the evidence and so contrary to the evidence that it shocks one's sense of justice under the circumstances of this case?" DiMauro's Brief at 6.

DiMauro argues that the trial court abused its discretion in denying his claim that his verdict was against the weight of the evidence. *See id.* at 34-55. Specifically, DiMauro focuses his challenge to the weight of the evidence on the credibility of four of the Commonwealth's witnesses—Morelli, Soster, Alexander, and Rogers—describing them as "a rogue's gallery all seeking to escape a reckoning for their own criminal conduct," *id.* at 38, providing the following characterizations:

- Morelli as "a methamphetamine user involved in multiple murders who was given immunity regarding this murder in exchange for her testimony" and her testimony as "rife with inconsistencies";

- Soster as a heroin addict who was using the night of the murder, was unaware of what was happening and was only relaying information that Morelli had told him;

- Alexander as "a jailhouse informant with a reputation as a compulsive liar and multiple pending robbery cases"; and

- Rogers as a criminal who was coming forward "only weeks before trial because he knew that other witnesses had named him as the killer."

DiMauro's Brief at 35, 39, 47. DiMauro emphasizes that each of these witnesses "had pending criminal matters, prior convictions for *crimen falsi*, and/or a reputation for lying." *Id.* at 34. He also highlights statements the prosecutor made expressing his lack of confidence in the truthfulness of these witnesses, characterizing them as "very problematic people" and as potentially "holding back their own involvement" in Rossillo's death. *Id.* at 40 (quoting N.T., 8/1/2023, at 32-33).

DiMauro further asserts that the verdict is against the weight of evidence because it was not "supported or corroborated by any physical evidence, forensic evidence, or unbiased witness testimony." *Id.* at 34. Lastly, in what he describes as a "glaring omission," DiMauro criticizes the jury's verdict based on his assertion that "the Commonwealth presented no motive for [DiMauro] to murder the [Rossillo]." *Id.* at 42. He surmises that a "verdict based solely upon the uncorroborated, illogical, and self-serving testimony of these witnesses denies appellant justice." *Id.* at 35.

The following legal principles apply to a trial court's consideration of a challenge to the weight of the evidence supporting a conviction:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> Thus, to allow an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court.

**Commonwealth v. Juray**, 275 A.3d 1037, 1046-47 (Pa. Super. 2022) (quotation marks and citations omitted).

Our standard of review for weight of the evidence claims, however, differs from that of the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Id.** at 1047 (citation omitted).

The certified record reflects that the jury was well aware of the credibility issues relating to Morelli, Soster, Alexander, and Rogers. In fact, in addition to the prosecutor's remarks, the trial court gave the jury several instructions relating to the credibility of each of these witnesses.

Regarding Morelli's testimony, the trial court gave the jury a corrupt and polluted source instruction. N.T., 8/4/2023, at 36-38; **see also Commonwealth v. Wholaver**, 177 A.3d 136, 165 (Pa. 2018) (explaining that a corrupt and polluted source instruction informs the jury that a questionable and biased "source whose testimony should be viewed with great caution" and is necessary if the evidence is sufficient to support an inference that a witness acted as an accomplice). Specifically, the trial court instructed the jury that Morelli had received immunity for her involvement in [Rossillo]'s murder in exchange for her testimony; that the jury could "regard her as an accomplice;" and that the jury should view her testimony "with disfavor," accept it "only with care and caution," and consider whether her testimony "is supported in whole or in part by other evidence." **Id.** at 38.

With respect to Soster's testimony, the trial court instructed the jury on several factors to consider in weighing the testimony of each witness and determining their credibility, including, and of relevance to Soster's testimony, the "accuracy of his or her memory and recollection; his or her ability and opportunity to acquire knowledge of or to observe the matters concerning which he or she testifies"; and "the consistency or inconsistency of his or her

testimony as well as its reasonableness or unreasonableness in light of the evidence in the case." *Id.* at 13-14. The trial court also informed the jury that it could consider Soster's prior conviction of retail theft in assessing his credibility. *Id.* at 35.

Similarly, the trial court instructed the jury that it should consider Rogers' and Alexander's criminal histories and the fact that they had open cases with pending charges in determining the credibility of their testimony. *Id.* at 35-36. The court further instructed the jury to consider the type of crimes they had committed or allegedly had committed, i.e., their multiple crimen falsi convictions and charges, how long ago those crimes occurred, and how their criminal histories and current situations affected the likelihood that they credibly testified during DiMauro's trial. *Id.* The jury also heard testimony that Alexander had a reputation for untruthfulness. N.T., 8/3/2023, at 49.

Additionally, the certified record includes independent testimony that corroborated Morelli's testimony identifying DiMauro as Rossillo's murderer. Specifically, Alexander testified that DiMauro told him while they were cellmates that DiMauro and "a female" had killed Rossillo. N.T., 8/2/2023, at 134. Although Morelli did not admit to helping DiMauro kill Rossillo in her testimony and thus, her testimony differed from Alexander's in this respect, both Morelli and Alexander, two independent witnesses who did not know each other, identified DiMauro as Rossillo's killer. *Id.*; N.T., 8/1/2023, at 133-44.

Additionally, contrary to DiMauro's assertion, the Commonwealth did present evidence of DiMauro's motive for killing Rossillo—namely, his unhappiness that Rossillo was sexually harassing Morelli's stepdaughter. *Id.* at 146-47.

DiMauro seeks for this Court to reweigh the evidence provided by the Commonwealth's witnesses and find that their testimony lacked credibility. It is well settled, however, that the factfinder is "the sole arbiter of the credibility of each of the witnesses," including "questions of inconsistent testimony and improper motive." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (Pa. 2017) (citation omitted). Indeed, the factfinder "is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit." *Id.* (citation omitted); *see also Commonwealth v. Page*, 59 A.3d 1118, 1130 (Pa. Super. 2013) (noting that "any conflict in the testimony goes to the credibility of the witnesses and is solely to be resolved by the factfinder") (citation omitted). To that end, the factfinder is free to believe or disregard any part of a witness' testimony. *Commonwealth v. Clemons*, 200 A.3d 441, 464 (Pa. 2019); *see also Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact") (citation omitted).

Here, all parties in the case took painstaking measures to ensure that the jury was aware of the credibility issues with Morelli, Soster, Alexander, and Rogers, thus providing the jury with all the information necessary to determine the weight to afford their testimony. Additionally, the trial court,

like the jury, heard all the evidence at trial, was aware of the credibility issues relating to each witness, and was permitted to resolve any inconsistencies in favor of finding that the verdicts were supported by competent evidence. **See Commonwealth v. Gilliam**, 249 A.3d 257, 270 (Pa. Super. 2021) (concluding that the trial court did not abuse its discretion in denying appellant's weight challenge where he merely asked this Court to assume the role of factfinder and reweigh the evidence in his favor). To the extent DiMauro requests that we re-weigh the evidence, we decline to do so. **See Collins**, 70 A.3d at 1251.

Following our review of the record, we discern no abuse of discretion by the trial court in determining that the jury appropriately weighed the evidence before it and that the verdict did not shock the conscience. **See Commonwealth v. Murphy**, 134 A.3d 1034, 1039-40 (Pa. 2016) (dismissing a challenge to the weight of the evidence where the jurors were made aware that one of the Commonwealth's primary witnesses had "entanglements in the criminal justice system, including … crimen falsi convictions[,]" as "disturbance of a jury verdict on weight-of-the-evidence grounds would be appropriate only in an exceptional case where the evidence weighs very heavily against the conviction"); **see also Juray**, 275 A.3d at 1046-47. As his challenge to the weight of the evidence is the sole issue DiMauro presents for our review, he is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>12/06/2024</u>